Randy Wayne CUMMINGS, Appellant,

v.

Sandra Lynn CUMMINGS, Appellee.

No. CA 07–1325.

Court of Appeals of Arkansas.

Feb. 11, 2009.

Tapp Law Offices, by: J. Sky Tapp, Hot Springs, for appellant.

The Farrar Firm, by: Bryan J. Reis, Hot Springs, for appellee.

JOHN MAUZY PITTMAN, Judge.

This appeal focuses on the financial aspects of a marriage that lasted almost forty years. Appellant Randy Cummings (husband) and appellee Sandra Cummings (wife) both appeal various aspects of the circuit court's ruling. Husband's arguments focus on the valuation and division of a family-owned business, the nominal alimony awarded to wife, and an award to wife of one-half of the value of gifts husband gave to a girlfriend (to whom he was later married) during the pendency of this case. Wife's arguments are that the circuit court's award of alimony was insufficient and that the court failed to enforce the parties' settlement agreement. We modify the circuit court's decree in one respect and affirm the decree as modified.

### Background

The parties married in 1967. In 1982, husband started a business, Quality Reinforcement, Inc. (QRI). Its value was one of the major issues at trial. Husband filed his complaint for divorce on March 26, 2004, seeking a divorce and alleging that there were property rights and debt obligations to be adjudicated. Wife filed a counterclaim seeking a divorce and division of the property.

On April 17, 2006, husband made a written offer of judgment pursuant to Ark. R. Civ. P. 68 whereby wife would receive QRI and would assume all liabilities for the business. Wife did not respond to the offer and rejected it at trial.

On August 31, 2006, the parties entered into a written "Property Settlement and Separation Agreement" that resolved some of the outstanding issues between the parties. Wife was to receive two vehicles, one jet ski, a Kawasaki Mule and trailer, and two storage trailers. Husband was to pay the $500 debt remaining on wife's vehicle. He was also to receive a $700 credit. Husband was to receive two pick-up trucks, one jet ski, a trailer, his guns, and his personal property. Husband was to assume the debt on his 2004 truck. The parties also agreed to equally divide the funds contained in certain accounts and certificates of deposit, as well as the proceeds from the sale of a mobile home and the sale of forty acres under contract. The parties further agreed to list a residence and adjacent lot for sale. If that

property was not sold within ninety days, it would be sold by the circuit court clerk. Husband also agreed to pay wife $600 per week in temporary maintenance and $600 per month for wife's rent during June through August 2006. The agreement reserved the issues of alimony and the valuation of QRI. Additionally, husband would be entitled to a credit of $20,000 if the court determined the value of QRI was above $50,000.

On September 7, 2006, the court entered a divorce decree granting wife a divorce, approving and incorporating the parties' written agreement, and reserving jurisdiction over the issues set out in that agreement.

### Evidence at Trial

Gary Welch, a certified public accountant appointed as the court's expert, testified that he valued QRI based on the earnings method. He determined that, as of September 30, 2005, QRI's value was $421,000, while the value as of September 30, 2004, was $449,000. On cross-examination, Welch acknowledged that his analysis was not based on interviews, depositions, or industry publications; instead, he relied on tax returns for ninety to ninety-five percent of his data. He also indicated that his value of QRI exceeded the actual value of the corporation's tangible assets by approximately six to seven times. He would not describe the difference as goodwill; rather, he characterized it as QRI's earning capacity.

Welch said that he did not consider the impact upon QRI if husband was unable to operate the business or personal goodwill attributable to husband. He did consider husband's presence as a "key man" as an element of the risk of management, which would result in a lower valuation of the company. On redirect examination, Welch distinguished QRI from professional prac-

tices because, according to Welch, QRI obtains work based on it submitting the lowest bid, not on the presence of a particular, licensed individual.

Rachel Kremer, also a certified public accountant, testified as wife's expert. She used an income approach similar to that used by Welch and valued QRI at $430,000. Her valuation was as of June 2006, when the parties were divorced. She considered husband's presence in the business as part of her company-specific risk rate, which would serve to decrease the value of the company. Kremer testified that she had not seen instances of personal goodwill that were not associated with a professional practice. Due to QRI not being a professional practice, Kremer did not assign a value to personal goodwill.

On cross-examination, Kremer testified that eighty percent of her valuation came from the fact that husband worked in the business and did not have to pay someone else to do the work he was doing. She added that beside husband paying himself a salary, he was compensated in other ways such as the company paying for a vehicle and that he had written company checks to pay for his divorce attorney and personal credit card bills. She also said that an owner can establish a successful business, but that does not make it personal goodwill. She also said that the fact that a former employee of QRI left to start his own business and was beating QRI on bids was an indication that it was corporate goodwill, not personal to husband.

Bruce Engstrom, certified public accountant and husband's expert, testified that there was little reason for anyone to pay a high price for the business because it is relatively cheap to enter. He also stated his opinion that some of the case law that prohibits the division of personal goodwill makes no distinction between professional practices and other commercial

enterprises. He asserted that QRI depended on husband's presence to be invited to bid and obtain work. Engstrom testified that, in order to sell the business, one would have to demand that husband remain with the business under an employment contract, with most of the purchase price being attributed to husband's employment contract. He concluded that the only way to properly value QRI was based on the net asset value of QRI's tangible assets. Prior to making his calculation as to value, Engstrom eliminated several of the corporation's assets that the parties used for personal use or had been distributed to the parties as a result of the settlement agreement. He asserted that the income approach was appropriate if it was irrelevant who owned the goodwill. He also opined that QRI had goodwill. Engstrom said that Kremer could not identify why QRI had goodwill that would cause it to earn more than a similar business and asserted that it was because of husband's presence. His opinion was that the stock of QRI was worth $60,674.

On cross-examination, Engstrom acknowledged that there were no cases in which a reduction for personal goodwill was allowed that did not involve a licensed professional, such as a doctor or an architect. He also repeated his belief that only husband, not the company, had the goodwill.

At a December 11, 2006, hearing on whether the circuit court would require him to continue to pay temporary alimony to wife, husband testified that each party received $850,000 in assets, pending the valuation of QRI. He denied sabotaging the business and asserted that he was still bidding for work. According to husband, he was almost fifty-nine years old and could no longer physically work as he previously had done. He also said that he had recently lost two key employees. He asserted that the company had made only $3,000 to $4,000 in the preceding three months so that he could not continue to pay wife $3,000 per month in alimony. Husband testified that there was only $26,000 in the company's bank account. He denied that he bought a jet ski for his girlfriend, stating that he received a jet ski under the parties' settlement agreement. He also purchased a jet ski dock that he placed at the house he shared with the girlfriend, as well as a washing machine. He was asked, over his attorney's objection, about his deposition testimony, taken prior to the decree, where he admitted that he gave his girlfriend $12,000 over a period of months. He also acknowledged that the company provided his girlfriend with a cell phone.

At a February 16, 2007, hearing, wife testified that she stood by her affidavit of financial means and answers to interrogatories as to her needs. She said that she had been diagnosed with spinal stenosis and a narrowing of her spine; that she walked with a limp; and that she was incapable of lifting anything without pain. She testified that she was caring for her niece's two-year-old daughter without compensation and that she sometimes picked the child up. She testified that she could not sit or stand for long periods without pain. She acknowledged that she did not have any medical documentation to support her claim. She stated that she did not know if she received $750,000 in assets, adding that she had no other source of income apart from investment income or the proceeds from the sale of property. During the marriage, wife was a housewife and did not work outside the home, except to occasionally assist with the bookkeeping and check writing at QRI.

Husband testified that wife wrote herself checks totaling $42,000 from the QRI account for personal use in 2004. He

again asserted that he could no longer physically continue to work in the same business due to his having carpal tunnel syndrome; because of a sciatic nerve problem in his back; and because he had undergone recent knee surgery. He asserted that, other than the assets and his continued presence, QRI had no value. The company did not own heavy equipment such as backhoes or excavators. He also asserted that he had seen videotapes of wife walking without a limp and carrying a forty-pound child and groceries without difficulty. He asserted that he should not have to pay alimony.

Dustin Tramel, a private investigator, testified that he conducted ten days of surveillance on wife and witnessed her walking without a limp; picking up a forty-pound child and groceries; getting into and out of a vehicle without trouble; and running on a couple of occasions.

## The Circuit Court's Ruling

On May 29, 2007, the circuit court issued a letter opinion containing extensive findings of fact and conclusions of law. The court first addressed the issue of alimony to wife. Wife was found to have no marketable skills, having been out of the workforce for approximately forty years. She was also found to suffer from spinal stenosis, which made full-time employment difficult. The court also considered the fact that each party would be receiving approximately $1,100,000 in property before concluding that wife's alimony should be a nominal $1 per year. The court retained jurisdiction for future modification, based on changes in circumstances, including whether the valuation of QRI was reversed or modified on appeal. The court then turned to the valuation of QRI. The court found that both wife's expert and the court's expert had valued the business as a going concern and having business good-

will. The court found that husband's expert had valued the business at approximately $60,000, based as if it were not a going concern, and that the business only had goodwill personal to husband. The court rejected the valuation by husband's expert as being inconsistent with Arkansas case law. The court averaged the values found by wife's expert and the court's expert to arrive at a final value of $425,500. Wife was awarded half of this amount, or $212,750. The court next addressed gifts husband had given to his girlfriend. The court found that husband admitted giving approximately $12,000 cash, together with other personal property totaling another $12,000. The court awarded wife $12,000 for her share of these marital assets. This appeal and cross-appeal timely followed.

## Arguments on Appeal

Husband argues five points on direct appeal, asserting that the circuit court erred by (1) valuing Quality Reinforcement, Inc., at $425,000 and awarding wife $212,750 for her interest in the corporation; (2) awarding wife alimony; (3) not recognizing provisions of the parties' settlement agreement as to a credit he was to receive; (4) failing to acknowledge husband's offer of the entire interest in the corporation to wife in lieu of having to pay her for her interest; and (5) finding that husband had made gifts totaling $24,000 to his girlfriend and awarding wife one-half of that amount. On cross-appeal, wife argues two points in which she contends that the circuit court erred in failing to enforce the parties' earlier oral settlement agreement and in awarding alimony that was insufficient to meet her needs.

## Standard of Review

On appeal, divorce cases are reviewed de novo. *Cole v. Cole*, 89 Ark.App. 134, 201 S.W.3d 21 (2005). We give due defer-

ence to the circuit court's superior position to determine the credibility of witnesses and the weight to be given their testimony. *Id.* With respect to the division of property in a divorce case, we review the circuit court's findings of fact and affirm them unless they are clearly erroneous. *Id.* The decision whether to award alimony is a matter that lies within the circuit court's sound discretion, and we will not reverse the decision to award alimony absent an abuse of that discretion. *Id.*

### Discussion

### I. Valuation and Division of Quality Reinforcement, Inc.

 We first address husband's first and fourth points, in which he challenges the court's valuation of QRI at $425,500, and asserts that the court failed to properly credit his offer to wife of QRI in its entirety instead of having to pay wife for her interest in the business. Husband contends that much of the value placed on QRI is the result of "goodwill" that is dependent upon his continued presence with the company.

The valuation of goodwill is a question of fact and is dependent upon the particular circumstances. *Cole, supra.* Here, the circuit court did not assign any goodwill to the value it found for QRI. The court noted that both Welch and Kremer had included goodwill for QRI in their valuations. However, the court did not place a value on the goodwill of QRI. Husband could have asked for specific findings of fact concerning the goodwill of QRI. The court's valuation of QRI is within the range of the expert testimony. The court also considered the fact that Engstrom's valuation did not comport with prior Arkansas case law in that there was a deduction for goodwill personally attributable to husband's continued presence in the business and that those cases had been ones involving professional practices, not ordinary commercial enterprises. Therefore, we cannot say that the circuit court's valuation of QRI was clearly erroneous.

Husband also argues that the circuit court erred in refusing to credit his Rule 68 offer of the entire business to wife. Rule 68 of the Arkansas Rules of Civil Procedure allows one making a bona fide offer of judgment equal to or greater than the amount ultimately adjudicated to collect costs for trial expenses incurred subsequent to the offer. The purpose behind this rule is to encourage early settlement of claims and protect the party who is willing to settle from expenses and costs that will subsequently accrue by providing a defendant the means to compel a plaintiff to consider anew the merit of his or her claim at the time the offer is made and whether continued litigation is appropriate. *See Warr v. Williamson*, 359 Ark. 234, 195 S.W.3d 903 (2004). This is a divorce case in which the circuit court has broad discretion in effecting an equitable distribution of the marital estate; moreover, the offer only addresses one aspect of the marital estate, QRI, while ignoring other property and debts that should be considered in determining whether the distribution is equitable. Even had wife accepted the offer, the circuit court would have been required to determine the value of the asset so as to effect an equal and equitable division of property and to determine whether alimony was appropriate. Under these circumstances, no litigation expenses would have been saved even had wife accepted the offer and, where the purpose of the rule is not served by the offer of judgment, we cannot say that the circuit court is required to find that the offer of judgment was bona fide.

### II. Alimony

Under this point, we discuss both husband's second point and wife's second

point on cross-appeal. Both points concern the court's award of alimony to wife. The circuit court awarded wife alimony of $1 per year and retained jurisdiction for future modification of the alimony award, including if the valuation of the corporation was reversed on appeal. Husband argues that there was no need to award wife alimony in light of the property she was awarded. Wife, on the other hand, argues that the award is insufficient because she had demonstrated need for alimony of $3,000 per month.

■ Alimony and property divisions are complementary devices that a circuit court employs to make the dissolution of a marriage as equitable as possible. *Cole, supra.* The primary factors to be considered in awarding alimony are the need of one spouse and the other spouse's ability to pay. *Id. Cole* also lists other, nonexhaustive factors for the circuit court's consideration, including the parties' financial circumstances, the amount and nature of the parties' income, both current and anticipated, the extent and nature of the parties' resources and assets, and the parties' earning ability and capacity. It is no longer necessary for the court to award nominal alimony in order to retain jurisdiction for future modification. *Mulling v. Mulling,* 323 Ark. 88, 912 S.W.2d 934 (1996); *Grady v. Grady,* 295 Ark. 94, 747 S.W.2d 77 (1988).

■ We cannot say that the circuit court clearly erred in awarding wife only a nominal amount of alimony. Wife filed an affidavit of financial means showing that her current expenses totaled $4,382 a month. Wife argues that she should receive alimony because she is unable to work because of her health. However, that is but one of the factors for the circuit court to consider. The circuit court's order indicated that it considered the proper factors, including the fact that wife was to receive over $1,000,000 in assets, with a substantial amount of cash. As pointed out above, alimony and property division are complementary devices designed to make the divorce equitable. This could indicate that wife does not "need" alimony. The circuit court indicated that it was awarding nominal alimony so that it could retain jurisdiction to later modify the amount if this court were to reverse or modify the value assigned to QRI. Such a consideration is proper. *Mason v. Mason,* 319 Ark. 722, 895 S.W.2d 513 (1995); *Cole, supra.* Therefore, no abuse of discretion has been shown.

### III.   Settlement Agreements

Husband's argument is that the court failed to enforce the parties' agreement that, if the court valued QRI as worth more than $50,000, husband would be entitled to a $20,000 credit. In her brief, wife concedes that husband is entitled to the credit. After entry of the divorce decree, the court issued a letter opinion stating that husband was entitled to the credit. Therefore, the circuit court's order should be modified to give husband a $20,000 credit against the amount he will have to pay wife for her interest in QRI.

For her argument on cross-appeal, wife asserts that the court erred in not enforcing an "agreement" placed on the record by the parties' attorneys in September 2005 that established the value of QRI and provided that husband would pay wife alimony of $2,150 per month until she turned sixty-five. The day before the original trial date, each party met in the offices of their attorney and negotiated via the telephone. An agreement was reached and confirmed via letter and e-mails between counsel. The next day, the attorneys appeared in open court and announced the settlement on the record. Approximately three weeks later, husband filed a motion

seeking to have the case set for trial, alleging that his attorney lacked the authority to make the settlement. Wife later filed a motion to establish and enforce the parties' agreement. In that motion, she asserted that the terms read into the record constituted a contract not subject to modification by the court.

■ We find no error on this point. Whether the parties intended to enter into a binding agreement, and whether the husband's attorney was authorized to do so without the approval of his principal, are questions of fact best resolved by the circuit court. Furthermore, even if it were intended to be a binding agreement between the parties, the circuit court was not bound by it. There are two types of property agreements regarding the payment of alimony. *Seaton v. Seaton*, 221 Ark. 778, 255 S.W.2d 954 (1953); *Linehan v. Linehan*, 8 Ark.App. 177, 649 S.W.2d 837 (1983). The court in *Seaton* distinguished between these two different types of agreements:

> One is an independent contract, usually in writing, by which the husband, in contemplation of the divorce, binds himself to pay a fixed amount or fixed installments for his wife's support. Even though such a contract is approved by the chancellor and incorporated in the decree, as in the *Bachus* [*v. Bachus*, 216 Ark. 802, 227 S.W.2d 439 (1950) ] case, it does not merge into the court's award of alimony, and consequently, as we pointed out in that opinion, the wife has a remedy at law on the contract in the event the chancellor has reason not to enforce his decretal award by contempt proceedings.
>
> The second type of agreement is that by which the parties, without making a contract that is meant to confer upon the wife an independent cause of action, merely agree upon "the amount the court by its decree should fix as alimony." *Pryor v. Pryor*, 88 Ark. 302, 114 S.W. 700, 129 Am. St. Rep. 102, which construed an agreement of the first type, and *Holmes v. Holmes*, 186 Ark. 251, 53 S.W.2d 226, involving an agreement of the second type. See also 3 Ark. L.Rev. 98. A contract of the latter character is usually less formal than an independent property settlement; it may be intended merely as a means of dispensing with proof upon an issue not in dispute, and by its nature it merges in the divorce decree. In the *Holmes* case we held that the second type of contract does not prevent the court from later modifying its decree.

*Seaton*, 221 Ark. at 780, 255 S.W.2d at 955–56.

## IV. Gifts to Girlfriend

Husband challenges the circuit court's decision to award wife $12,000 for her share of the value of gifts husband gave to his girlfriend during the course of this case. Husband does not argue that it was not proper for the circuit court to consider the gifts when determining the final property allocation because he cannot. In *Johnson v. Cotton–Johnson*, 88 Ark.App. 67, 194 S.W.3d 806 (2004), this court upheld an order that one party directly reimburse the other spouse for marital assets given to a paramour. In *Williamson, supra*, we affirmed an unequal division of property and debts that took the husband's gifts of marital assets to other women into account. Husband's argument is that the proof of these gifts came after the parties were divorced and had divided some of their assets, including a jet ski that husband received under the settlement agreement. However, at that time the circuit court had not made a final division of all of the parties' marital property. Therefore, the fact that the proof of

some of the values of such property came prior to the parties' written agreement is irrelevant. Moreover, the resolution of this issue depends upon the credibility of husband as a witness concerning whether he made such gifts. In such instances, we defer to the circuit court's resolution of the issue. *Johnson, supra.*

Affirmed as modified on direct appeal; affirmed on cross-appeal.

HART and BROWN, JJ., agree.