2010 Ark. App. 525

**Raymond L. FRIEND, Appellant**

v.

**Alice G. FRIEND, Appellee.**

No. CA 09–1189.

Court of Appeals of Arkansas.

June 23, 2010.

520

Bob A. Keeter, Bob A. Keeter, P.A., Mena, AR, for appellant.

Michael Hamby, Michael Hamby, P.A., Greenwood, AR, for appellee.

RITA W. GRUBER, Judge.

This divorce case has been before us previously, resulting in our unpublished opinion *Friend v. Friend*, CA07–779, 2008 WL 316128 (Ark.Ct.App. Feb. 6, 2008). We remanded and directed the trial court to explain its division of the income that Raymond Friend had received during the parties' separation and to make clear findings as to the amount of gold and silver he possessed and the amount to be awarded to each party. Lastly, we held that the trial court could reconsider the parties' personal property in relation to the total disposition of their property.

On remand, the trial court sent a letter to the parties' attorneys. It directed Raymond to produce to Alice thirteen ounces of gold and fifty ounces of silver, one-half of the amounts that he had admitted pos-

sessing in his deposition. The trial court added:

What I had intended to rule in regard to the Sedna monies [1] was that the undeposited funds were the only Sedna funds that remained uncomingled with other marital assets and that these should be divided equally. That is, $12,569.78 to each party. The remaining funds were deposited into a marital account and should be accounted for as part and parcel of these marital funds. This is all marital income received by Raymond during the marriage and the pendency of this divorce. The records on this are a mess. The court could not determine anything much from the evidence submitted. The court intended to rule that any funds expended by Raymond toward marital expenses should be credited to Raymond prior to equal division of all marital funds received by him during the pendency of the divorce. In order to make any sense of this a forensic accountant needs to be appointed by the court at the parties' expense to make a determination as to what happened to all these monies. This is of course separate from the monies that Mr. Friend tried to hide in the little scam of the cashiers checks. This can be avoided and the costs can be as well if the parties can settle this matter or stipulate as to the marital monies that have passed through Mr. Friend's hands.

As to the personal property I was under the impression that this had been agreed upon with the exception of some 8 items. Ms. Friend was to go to the Shady residence and secure those items she had agreed to take. This never occurred. The court has no knowledge of the extent of the property items and each party will have to account for them and to itemize them. In the event that the items cannot be agreeably divided then the court will appoint an auctioneer to appraise and then we will have a sale. If the parties cannot divide their property prior to the sale the money received from the sale can be easily divided by the court.

I reached my frustration level in this case and it will be concluded. If either of you have a differing interpretation of the court's remand please advise.

Because the parties had not reached an agreement dividing the personal property, the circuit court appointed auctioneers to appraise, inventory, and sell all of the parties' property and ordered Raymond to cooperate. It also directed them to account for any property that they had removed from their residence in Alabama and warned that any noncompliance could result in their being jailed for willful contempt. The sale of the items in Raymond's possession brought in $41,055.75, and the sale of those in Alice's possession produced $2,527.65.

In November 2008, Alice asked the court to hold Raymond in contempt after she discovered that he had secreted and failed to sell various items. She said that Raymond had failed to sell a wrecker and that a neighbor had discovered another item hidden in thick underbrush on Raymond's property. She asked that Raymond be jailed; that the court award her the items secreted by him; and that it award her attorney's fees and costs. She also asked the court to order Raymond to reimburse her for the added expense of addressing bogus 1099 tax forms that he had caused to be filed with the IRS and for marital

1. The parties' share of a working interest in a natural-gas well was sold through Sedna Energy, Inc.

debts that she had paid. She further asked for a declaratory judgment as to the remaining gold and silver.

The same day, Alice moved for partial summary judgment on the issues of the distribution of the Sedna and real-estate income. She stated that each party had already received $12,569.78, which reflected one-half of the undeposited Sedna funds that Raymond had received. Alice also stated that the court could resolve the issues as to the remaining marital income received by Raymond (the deposited Sedna funds, the income from the two contracts of sale, and the income from the lease of the shop) by reconsidering the evidence that had been introduced at trial. Alice asserted that the uncontroverted amount of income that Raymond had received during the divorce action was $87,814.54, from which should be subtracted the $25,139.56 that had already been divided between the parties. She stated that the balance of $62,674.98 should be reduced by the $3,000 in temporary alimony that Raymond had paid her, leaving $59,674.98 in income that he had retained to her exclusion, which, according to the circuit court, was to be divided equally between the parties after deducting any marital expenses paid by Raymond. She pointed out that, in response to questioning from his attorney at trial, Raymond had acknowledged that the only marital debt he had paid during that time was $12,473.92 ($779.02 monthly) toward the mortgage on the house in Alabama.[2] After deducting this amount, $47,201.06 was received by Raymond to her exclusion; she asked for half, $23,600.53.

Raymond moved for Alice to be held in contempt for failing to produce certain items of marital personal property for auction. He also alleged that the parties had reached an agreement whereby each would receive one parcel of land in Polk County; although he had signed and delivered his deed to Alice, she had failed to reciprocate. In response, Alice explained that she had not given him the signed deed because he had not yet provided her with an accounting of the balance due on the contract to purchase the land to be conveyed to her.

In January 2009, Raymond's attorney sent a letter to the trial court acknowledging that, during the separation of the parties, his client had received $66,364.54 from Sedna; $10,400 from renting the shop; and $11,050 from the two contracts on the land. He agreed that, from the $87,814.54 he had received, he should receive credit for $25,139.56 already divided between the parties; $3,000 in temporary support he had paid Alice; and $12,473.92 for his payments on the property in Alabama, leaving a remainder of $47,201.06. He alleged that Raymond was also entitled to receive credits for twenty-one additional items. He concluded:

> It is submitted that, after deduction of the aforesaid credits in the sum of $31,763.50, the remaining balance of $15,437.56 is involved in this proceeding and that Mrs. Friend's one-half (½) thereof is in the sum of $7,718.78.

> I'm attached [sic] hereto as Exhibit B copies of two (2) checks which were paid by my client to Mrs. Friend and the total of these two (2) checks is in the sum of $19,576.19. The sum of $12,569.78 from these two (2) checks was for Mrs. Friend's one-half (½) of the $25,139.56 which was ordered divided between the parties and therefore the sum of $7,006.41 should be applied tomore.

---

**2.** Raymond testified that the amount was $11,615.80, but Alice gave him credit for

wards the sums owed by my client to Mr. Friend.

It is therefore the position of my client that he has overpaid the sum of $712.37 to Mrs. Friend.

A few days later, Alice's attorney sent a letter to the trial court stating that the parties were in agreement on the deductions leading to the balance of $47,201.06 received by Raymond to Alice's exclusion. As to the other items, Alice disagreed. Listing each of the twenty-one items claimed by Raymond, Alice's attorney explained why Raymond should receive no credit for each one: some were paid prior to the filing of the divorce action; some were paid for property of which Raymond had possession during the divorce; some of the payments were made after the parties were divorced; some were made after Raymond purchased the property at the judicial sale; some were paid prior to the parties' separation; and some were related to the preparation or payment of income taxes when the parties filed separately. Alice's attorney also stated that the two checks totaling $19,576.19 claimed by Raymond had been paid to reimburse her for her previously acknowledged share of the income that Raymond had received from Sedna, and of the income that he had received from Sedna, the sales contracts, and rent between January and May 2007.

On January 29, 2009, the circuit court granted partial summary judgment in the amount of $23,600.53 to Alice. Accepting the parties' agreement regarding the calculations by which they had arrived at the $59,674.98 figure, it added:

> The Court further finds that Mr. Friend's accounting filed herein is not informative as to the issue of any marital debt which he paid out of these remaining proceeds. According to Mr. Friend's testimony when questioned by his attorney, he indicated that the only marital debt that existed was the mortgage payment on the Alabama property. According to the accounting provided by Mr. Friend to this Court, he paid $10,262.10 towards such expenses. However, Mrs. Friend has agreed to stipulate, that the payments due and owing during this time frame were $779.62 per month. If you multiply that figure times 16 months, she is willing to give credit to Mr. Friend for $12,473.92 paid towards this marital expense. This leaves a balance of $47,201.06 as marital income received by Mr. Friend during the pendency of this action, to the exclusion of Ms. Friend.

The court held a hearing regarding all pending issues on June 15, 2009. Alice; Raymond; Amy Voysin (their daughter); Diana Cagle (the parties' accountant, who had testified in the original hearing); Alvin Ralston (a neighbor of Raymond's); Michael Hardy (a private investigator); Leslie Olson (a purchaser of real property from the parties); Beau Davis (a friend of Raymond's); and Marsha Rogers (Raymond's girlfriend) testified.

On July 2, 2009, the circuit court made detailed findings of fact and entered an order granting judgment to Alice against Raymond in the amount of $99,390.46. The court noted that Raymond had not paid Alice the $23,600.53 awarded previously. It found that Raymond had "repeatedly and blatantly attempted to defraud this Court by secreting property," which had cost Alice additional attorney's fees and costs. The court found that Raymond had willfully hidden a barbeque grill in a brush pile and that he had failed to marshal for sale other items of personal property, such as a wrecker and an automobile. The court added:

> These contemptuous actions by Mr. Friend reflect a continuation of behavior by him which this Court has observed

throughout the course of this litigation. During the initial divorce hearing, testimony revealed, and Mr. Friend admitted that he had secreted $200,000 by placing the same in $50,000 cashier checks payable to four of his friends for what he identified as "business repayments." The court addressed this issue in the original hearing, but notes the same to illustrate the contempt and disrespect Mr. Friend has exhibited towards this Court and its Orders.

The court directed Raymond to give the barbeque grill, wrecker, and automobile to Alice or go to jail and awarded her a partial attorney's fee of $5000 because of his willful, contemptuous actions. The court denied Raymond's countermotion for contempt but gave him credit for $375 for a golf cart, refrigerator, washer, and dryer. The court instructed Alice to give Raymond a wreath-making machine. It found that other items, such as jewelry, a mink coat, quilts, and a tea cart, had been gifts to Alice, and that a wine cart belonged to the parties' daughter. It awarded Raymond one-half of the Christmas decorations made by the parties' grandchildren. The court found insufficient proof as to the other items. The court noted that Mr. Olson and Raymond had testified that no prepayments had occurred on the real-estate contract and awarded Alice $4950 for the income Raymond had received from October 2008 through June 15, 2009, on that contract. The court also found that, in January 2008, Raymond had caused numerous 1099 forms, which inaccurately reported income received by Alice, to be filed with the IRS. The court stated: "Mr. Friend could not explain to the Court ┃₈the purpose of the same nor could he give any explanation as to where he derived the amounts listed thereon." The court ordered Raymond to pay Alice $1650 for the additional costs that Alice had incurred to dispute the erroneous information with the IRS and retained jurisdiction for any tax liability she might incur as a result of Raymond's actions. The court awarded Alice $5,205.63 for Raymond's one-half of the marital debts that she had paid after the January 2007 hearing. It added that it found the testimony and evidence presented by Raymond to be "unpersuasive and not credible."

The court made the following findings as to the gold and silver:

As to the gold and silver issue, this Court had previously found that Mr. Friend would be bound by the answers he provided in his first deposition taken prior to the original divorce hearing herein. The Court finds that at page 64 of his first deposition, Mr. Friend testified that he did not sell or give away any gold or silver. The Court further finds that, over the course of this litigation, Mr. Friend has testified to varying amounts of gold he had in his possession. At page 425 of the original divorce hearing transcript he testified that at one time he owned $40,000.00 to $50,000.00 worth of gold. At page 1017 of the original divorce hearing transcript he further testified that at one time he possessed 250 ounces of gold. At the time of the January 7, 2007 divorce hearing, he testified that he had disposed of the aforementioned gold over a period of time through individuals whose names he did not recall and that such transfers were in small quantities and sold at places he did not recall. He further testified, that as of January 2007 he had in his possession only 26 ounces of gold and 100 ounces of silver. Both parties testified that approximately three months after the January 2007 [sic] Ms. Friend and her attorney went to Mr. Friend's house to conduct an inventory and at that time Mr. Friend produced 200 ounces of silver and 26

ounces of gold and gave Ms. Friend 100 ounces of silver and 13 ounces of gold. Ms. Friend testified that she accepted the same, not as an equal division, but in an effort to preserve at least this small quantity of gold and silver pending a decision on her appeal. As mentioned above, the Court of Appeals remanded this issue for further consideration due to the inconsistencies in the record and due to the lack of clarity in the Court's original ruling.

....

Diana Cagle, a CPA, testified at both the original divorce hearing and the remand hearing. She specifically testified that she as a registered gold dealer had assisted Mr. Friend in purchasing a minimum of 400 ounces of gold and 1400 ounces of silver between 1999 and 2004.... Mrs. Cagle presented to this Court two exhibits, a cancelled check and a rather large deposit slip, which she testified reflected records of payments from Mr. Friend for a portion of the aforementioned gold purchases. Mrs. Cagle further testified that she had prepared Mr. and Ms. Friend's tax returns for 1999 to 2004 and at no time during that time frame was any gold or silver reported sold by Mr. Friend as a gain or loss. She further testified that she had reviewed each of Mr. Friend's tax returns since 2004 and found that no gold or silver had been reported on those returns either. Mrs. Cagle further testified that it would be highly unlikely, if not impossible, to dispose of the quantity of gold testified to by Mr. Friend in small amounts and in the manner he described due to the nature of the market. Mrs. Cagle further testified that as of the time of the divorce hearing in January 2007 the rate for gold was $648.00 per ounce and the rate of silver was $12.00 per ounce.

....

The Court holds Mr. Friend to the testimony contained in his first deposition, *i.e.*, that he did not sell any gold or silver. The Court further holds Mr. Friend to his testimony that at one time he possessed 250 ounces of gold. The Court finds Mrs. Cagle's testimony in regards to the silver possessed by the parties persuasive and finds that Mr. Friend was in possession of 1400 ounces of silver. After giving Mr. Friend credit for the gold and silver he has already provided to Ms. Friend, *i.e.*, the 100 ounces of silver and the 13 ounces of gold, the Court finds that the fair market value of the undelivered gold is $72,576.00 and the fair market value of the undelivered silver is $7,200.00, for which Ms. Friend is given a judgment against the Plaintiff with said judgment to bear interest at the rate of 6% per annum until paid.

Raymond filed a timely notice of appeal.

██ On appeal, we review divorce cases de novo. *Cummings v. Cummings*, 104 Ark.App. 315, 292 S.W.3d 819 (2009). We affirm the circuit court's findings of fact as to the division of property unless they are clearly erroneous. *Id.* We give due deference to the circuit court's superior position to determine the credibility of witnesses and the weight to be given their testimony. *Id.*

### Debts

Raymond contends that the trial court erred in refusing to give him credit for payments he claims to have made on marital debts during the divorce proceeding. He does not disagree with Alice about the amounts to be deducted from the $87,814.54 he received when arriving at the net sum of $47,201.06, but he argues that he is entitled to receive credit for twenty-one additional items that he paid to pre-

serve the marital estate. He contends that the trial court's refusal to credit him with these expenses resulted in an unequal distribution of marital property. We disagree.

The trial court based its decision on Raymond's testimony at the first trial that the only marital expense he had paid during the pendency of the divorce was the mortgage on the Alabama property. As Alice points out, he asks to be credited with payments for lawn mowing; the preparation of his separate income taxes; his separate income tax liability; insurance on his shop and the home where he was living; payments he made before the divorce action was filed (especially the $23,852 principal payment on the Alabama property); and for expenses he paid after the 2007 divorce hearing.

■ Arkansas Code Annotated section 9–12–315 (Repl.2009) provides that "all marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable." The court may make some other division that the court deems equitable; however, when it decides not to divide the property equally between the parties, it must recite its basis and reasons for the unequal division in its order. Ark.Code Ann. § 9–12–315(a)(1)(B). The allocation of marital debt is an essential item to be resolved in a divorce dispute, and must be considered in the context of the distribution of all of the parties' property. *Boxley v. Boxley*, 77 Ark.App. 136, 73 S.W.3d 19 (2002). However, section 9–12–315 and its presumption of equal division does not apply to the division of marital debts. *Gilliam v. Gilliam*, 2010 Ark. App. 137, 374 S.W.3d 108. There is no requirement that the marital debt must be subtracted from the marital assets to determine the "net" value of the total award made to each party in all divorce cases. *Id.* A determi-

nation as to how debts should be allocated between the parties will not be reversed unless it is clearly erroneous. *Id.* Additionally, the court has broad powers to distribute property in order to achieve a distribution that is fair and equitable under the circumstances; it need not do so with mathematical precision. *Coatney v. Coatney*, 2010 Ark. App. 262, 377 S.W.3d 381. Because the trial court's allocation of the marital debt was supported by Raymond's admission that the only marital debt he had paid was on the Alabama property, we affirm on this point.

■ Raymond also argues that the trial court erred in ordering him to pay half of the amount that Alice paid to creditors for marital debts shortly after the divorce. He submits that her testimony about these payments was not adequately supported by written documentation and argues that the trial court should have treated the parties equally. At the remand hearing, Alice testified that she had settled some marital debts that included Raymond's credit card and submitted documents to support her payments to Focus Receivables Management, Midland Credit Management, Citibank, Transworld Systems, and Capital One. This is another example of the trial court's view of the parties' credibility. It considered Alice's testimony believable and was satisfied with her documentation of the payments. We reject Raymond's argument on this issue and affirm the trial court's decision.

*Attorney Fees*

Raymond further argues that the trial court abused its discretion in awarding a $5000 attorney's fee to Alice because of his contemptuous actions. He downplays his behavior; argues that the punishment was "overly severe"; and describes the items that he failed to produce for the auction as "a homemade barbeque grill, a worn-out,

essentially inoperative wrecker ... [and] an old car which Mr. Friend drove to the court house the day of the hearing...." He asks us to credit his testimony that he had no intention of hiding the grill; that he simply placed it where it would not be seen because he was tired of people borrowing and not returning it; that he did not own the wrecker; and that he had no title to or license for the car.

In response, Alice reminds us of the numerous instances of Raymond's contemptuous behavior; for example, he lied in his October 2006 deposition about hiding $200,000 in marital funds, and he attempted to convey all of the marital property, including the gold and silver, to his friends Howard Hall and Martha Hall in May 2007. It is clear that Raymond was fully aware of what was expected of him in marshaling the property before the auction and that he could be jailed for contempt if he did not comply. Alvin Ralston testified that he discovered the ⌊13 barbeque cooker in an unexpected location, a thicket, which he said was located a couple of hundred yards from Raymond's house. Michael Hardy took photographs of the cooker hidden in the brush.

 The circuit court has the inherent power to award attorney's fees in domestic-relations proceedings, and whether it should award fees and the amount thereof are matters within its discretion. *Gilliam, supra.* The circuit court is in a better position than we to evaluate the services of counsel and observe the parties, their level of cooperation, and their obedience to court orders. *Id.* In contempt cases, the trial court has discretion to fashion the punishment to fit the circumstances. *Conlee v. Conlee,* 370 Ark. 89, 257 S.W.3d 543 (2007). In fact, a finding of contempt is not a prerequisite to an award of attorney's fees. *Rogers v. Jennings,* 2010 Ark. App. 428, 375 S.W.3d 698

In light of Raymond's lack of credibility, attempts to hide significant amounts of money and other property from Alice, and consistent failure to cooperate, we see no abuse of discretion in the award of attorney's fees to Alice.

### Real Estate Contract Payments

 Raymond also asserts that the trial court erred in awarding Alice $4950 for the October 2008 through June 2009 payments on the real-estate contract for the sale of the property that he agreed to convey to Alice. Raymond argues that he offered Alice one-half of the payments, but she refused to accept them; therefore, it was her fault that the agreement was not performed. We disagree. Pursuant to the parties' agreement, Alice was to receive the Olson property with the existing real-estate contract thereon, and Raymond would receive the Pearce ⌊14 property. Mr. Olson, a longtime friend of Raymond's, continued to send his payments to Raymond rather than Alice. Additionally, Beau Davis, the homeless man who lived in a trailer on Raymond's property, testified that he held Mr. Olson's power of attorney. Mr. Davis was one of the people who received a $50,000 cashier's check when Raymond attempted to hide $200,000 from Alice. At the most recent hearing, Alice's attorney said that she was ready to exchange the deeds as soon as Raymond confirmed in writing the remaining balance owed under the Olson contract; that she did not want to give him the deed until she knew the actual value of the property that she was to receive; that, even though he had sent numerous letters to Raymond's attorney requesting written confirmation of the remaining balance owed under the contract, Raymond had not done so; and that Alice was entitled to 100 percent of the payments made during this time. Finally, at trial, Raymond stated that there

had been no prepayment on the Olson contract. The court informed him that if prepayment had occurred, Raymond would make up the difference. In light of Raymond's behavior, as noted herein, it was reasonable for Alice to withhold the Pearce property deed until Raymond provided her with the correct balance due on the Olson contract. The trial court did not err in awarding Alice $4950 for the payments that should have gone to her.

### CPA Fees

Raymond next argues that the trial court erred in requiring him to pay the $1650 in additional CPA costs that Alice incurred as a result of erroneous 1099 forms that were reported to the IRS. Diana Cagle testified that, because of the 1099 forms, it had cost an additional $1650 to prepare Alice's 2007 tax returns. According to Ms. Cagle, the income reported on the 1099 forms was not taxable and required a significant amount of additional accounting work to provide documentation to the IRS. Raymond could give no explanation at the hearing as to why the 1099 forms were issued but admitted that he had provided the figures to his accountant and had asked him to prepare the erroneous 1099 forms. The trial court did not abuse its discretion in ordering Raymond to pay Ms. Cagle's additional accounting fees.

### Gold and Silver

Lastly, Raymond challenges the trial court's findings concerning the gold and silver and faults its taking of additional evidence about the issue on remand. Although we did not expressly state that the trial court could take such additional evidence as was necessary for a just resolution of the issues, we did not prohibit it from doing so. In any event, Raymond suffered no prejudice in this regard because the evidence introduced at the original divorce hearing was referenced in the final court order and supported the trial court's findings. We will not reverse in the absence of prejudice. *Nelson v. Stubblefield*, 2009 Ark. 256, 308 S.W.3d 586 In the portion of his October 2006 deposition admitted into evidence at the January 2007 hearing, Raymond testified that he had 26 ounces of gold and 400 ounces of silver then in his possession. He had no memory of ever selling or giving away any gold or silver. At the January 2007 hearing, Raymond said that at one time he had owned between $40,000 and $50,000 worth of gold and that he had "possibly purchased up to 250 ounces of gold" from Diana Cagle in 1999 or 2000, but, through a "friend," had sold it in small amounts for the same price that he had paid for it. Diana Cagle testified that, between 1999 and the parties' separation, Raymond had ordered a minimum of 400 ounces of gold and 1400 ounces of silver through her and told her not to let Alice know. Ms. Cagle also stated that Raymond had not reported any capital gain or loss from the sale of gold or silver on his tax returns.

The trial judge set forth in great detail which testimony he found credible when determining the amount of marital but undelivered gold and silver owned; then the judge precisely divided what should have been produced by Raymond. The trial court's findings on this issue were not clearly erroneous.

Affirmed.

VAUGHT, C.J., and BROWN, J., agree.