2011 Ark. App. 546

**Robert E. BAMBURG, Appellant**

v.

**Lisa J. BAMBURG, Appellee.**

**No. CA 10–1158.**

Court of Appeals of Arkansas.

Sept. 21, 2011.

Rehearing Denied Nov. 2, 2011.

---

8. *Fayetteville Sch. Dist. v. Kunzelman*, 93 Ark.   App. 160, 162, 217 S.W.3d 149, 151 (2005).

Allison Rene' Allred, North Little Rock, for the Appellant.

Kathy Louise Hall, Bryant, for the Appellee.

JOHN B. ROBBINS, Judge.

This is an appeal of a divorce proceeding heard in Pulaski County Circuit Court after twenty-two years of marriage between appellant Robert (Bob) Bamburg and appellee Lisa Bamburg. Bob appeals portions of the trial court's order that (1) awarded primary custody of their two children to Lisa; (2) divided the parties' business and personal property interests; and (3) failed to order Lisa to reimburse Bob the full amount of marital funds spent by her toward an adulterous relationship. Lisa cross-appeals the trial court's denial of her request to "reconcile the parties' joint checking account" and to order Bob to pay her half of his marital income diverted during the pendency of divorce. Each contends that the trial court's findings are clearly erroneous on their issues raised on appeal. We affirm on direct appeal on his first and third points, we reverse in part on his second point, and we affirm on her cross-appeal.

With regard to custody, the primary consideration is the welfare and best interests of the children involved; all other considerations are secondary. *Hicks v. Cook,* 103 Ark. App. 207, 288 S.W.3d 244 (2008). The factors a trial court may consider in determining what is in the best interest of the children include the psychological relationship between the parents and children, the need for stability and continuity in the relationship between parents and children, the past conduct of the parents toward the children, and the reasonable preference of the children. *Rector v. Rector,* 58 Ark. App. 132, 947 S.W.2d 389 (1997). On appeal, we perform a de novo review, but we will not reverse unless the findings are clearly erroneous. *Taylor v. Taylor,* 353 Ark. 69, 110 S.W.3d 731 (2003); *Ross v. Ross,* 2010 Ark. App. 497, 2010 WL 2404168. This necessarily turns in large part upon credibility determina-

tions, and we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the children's best interest. *Sharp v. Keeler,* 99 Ark. App. 42, 256 S.W.3d 528 (2007). There are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry as great a weight as those involving children. *Judkins v. Duvall,* 97 Ark. App. 260, 248 S.W.3d 492 (2007).

With regard to property division, Ark.Code Ann. § 9–12–315 (Repl.2009) requires that the trial court divide marital property equally between the parties unless the trial court finds such a distribution inequitable. The statute requires the circuit court to consider the following factors when making an unequal division of marital property: (1) length of the |₃marriage; (2) the age, health, station in life of the parties; (3) occupation of the parties; (4) amount and sources of income; (5) vocational skills; (6) employability; (7) estate, liabilities, and needs of each party and the opportunity of each for further acquisition of capital assets and income; (8) contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker; and (9) the federal income tax consequences of the court's division of property. § 9–12–315(a)(1)(A). While the trial court must consider these factors and state its reasons for dividing property unequally, it is not required to list each factor in its order nor to weigh all the factors equally. *Keathley v. Keathley,* 76 Ark. App. 150, 61 S.W.3d 219 (2001). Appeals of property-division cases are also reviewed de novo; we will affirm unless the trial court's findings are clearly erroneous. *Hernandez v. Hernandez,* 371 Ark. 323, 265 S.W.3d 746 (2007).

In this case, the parties married in 1988, separated in 2009, participated in a three-day divorce hearing in June 2010, and were divorced by decree filed in July 2010. They bore two children, a daughter EB born in March 1995, and a son JB born in December 1996. Both parties sought to be granted a divorce from the other, wanted full custody of the children, and loved and cared for the children.

Multiple witnesses described each parent's positive parental qualities. By all accounts, EB was a bright and pleasant teenage girl, and JB was a sweet, severely autistic pre-teen boy. Bob, an attorney with a private law practice and city-attorney position in Jacksonville, was an active participant in the children's raising, but Lisa took the primary role in day-to-day activities for them. Lisa owned a small gift shop that was open only in November and |₄December each year, she worked on occasion as a contract laborer at UAMS, and she received dividends each year from her portion of stock in her family's business.

Lisa testified in late 2009 at the temporary hearing, denying any romantic relationship with Mary Alice Hughes. Lisa and Mary Alice lied repeatedly at that hearing, acknowledging that they were very best friends but denying they were romantically involved. At the final hearing, Lisa admitted it fully, stating that it had begun in the summer of 2009 around the time of separation. She reasoned that she had not yet told their daughter and wanted to do that first. Lisa believed that Mary Alice was a good person who was good to her children. She denied that Mary Alice had moved in, but she agreed Mary Alice was present a lot of the time prior to the temporary hearing, spending the night at her home and traveling with her and the children.

At the end of the temporary hearing, the judge told the parties that Mary Alice was not to "be around" the children. Lisa said she obeyed that order but did not prevent

contact by e-mail or text until her attorney informed her what the order actually recited. Lisa believed that she should be the primary custodian because she had served in that role their entire lives, and she was much more involved in every aspect of their raising. She believed the children, especially JB, were more content in her care than their father's.

A psychological examination demonstrated that Lisa was a steady, balanced person, and that JB was nonverbal, required special attention, and was demonstratively secure with his mother. JB attended a school with special educational services and one-on-one attention. One of his teachers testified about JB's day-to-day experiences and emotions since the divorce proceedings were initiated as well as the high level of care he required.

Regarding travel and entertainment expenses, Lisa agreed that she spent some but not a lot of marital funds during her and Mary Alice's travels. Mary Alice testified that she (Mary Alice) paid for a good bit of their travel, and when Lisa charged items attributable to her (Mary Alice), she would reimburse Lisa for it. Mary Alice admitted that she lied about the nature of their relationship at the temporary hearing. She said that she had developed a friendly relationship with Bob and Lisa when their marriage was still intact, and she was involved in the same church before and after they separated. She maintained her own residence in North Little Rock and had a steady job, but she admittedly spent lots of time with Lisa and her children. She said she understood that after the temporary hearing, she was not to be around the children, meaning in their presence, but thought it was okay to contact them by other means.

Although EB attended a church-affiliated private high school at the time of the divorce, Lisa had home schooled her from grades one through eight. EB expressed a strong desire to live with her mother. EB loves and respects her father, but she explained that her mother was much more involved, affectionate, and patient than her father. EB had a good relationship with her mother's girlfriend, was eventually informed of the nature of the relationship, and had no problem with it. She added that her mother and Mary Alice did not flaunt their relationship. She said she was upset at not being able to be with Mary Alice while the divorce was pending, which she blamed on her father. She said her little brother also liked their mother's girlfriend very much and that they had an affectionate bond. EB added that JB's behavior and responsiveness deteriorated when they stayed at their father's house for a few days and that their father was very strict.

Bob held strong reservations about Lisa having custody of their children because Lisa was in an adulterous homosexual relationship and openly had her girlfriend stay overnight while the children were present. He believed their romantic relationship started earlier than either was willing to admit. Bob disapproved of Lisa and Mary Alice sleeping in the same bed together when the children were present, a sign of poor judgment and morals. Although he did not question Lisa's basic skill at parenting, he asserted that Lisa's relationship was detrimental to the children's welfare and embarrassing for them. He called into question Lisa's removing photographs of him in the marital home, replacing them with photos containing her girlfriend. He stated that Lisa was not compliant with the court's temporary order, allowing Mary Alice continued contact with their children and demonstrating disdain for authority to their children. Bob asserted that he was always the disciplinarian in the

household, which the children needed, as opposed to the "friend" that Lisa was.

As far as the personal property and realty, Lisa was content to allow it all to be sold and the proceeds divided if they could not come to an agreement. She wanted their marital savings and retirement accounts evenly divided. She freely acknowledged particular funds that Bob traced to a premarital account, so that he should keep one large account valued at approximately $234,000 despite it being opened during the marriage. She claimed ownership of her premarital interest in her family's business, which had been her primary source of income. Her share of the income from this subchapter S corporation reportable for income tax purposes varied from year-to-year but exceeded $200,000 in both 2008 and 2009.

Lisa testified to an estimated $18,000 value of the inventory in her Kids Korner shop that she operated seasonally. She was open to Bob taking half of that inventory, but she thought she should just keep the interest in Kids Korner, and Bob should keep his law practice, although he was winding down to become a full-time city attorney.

Lisa complained that Bob stopped depositing his paychecks from the city-attorney job into their joint checking account when they separated, which she believed amounted to about $50,000 of income that he did not share. She said Bob did not give her half of their $575 in monthly rental income on one of their properties for five months in 2009 and two months in 2010. She said Bob wrongfully took $21,000 out of their joint account in December 2009 for his own use. Although Bob presented her an accounting in January 2010 with a tally of the checks he wrote attributable to Lisa and the children in the amount of $21,246.90, she disputed its accuracy. Lisa also said Bob had failed to share in his part of the children's expenses for things like JB's medicines and mowing fees at a rental house.

Bob wanted an even division of everything, although he thought it detrimental to them both if they sold all their personal property by court order and divided the proceeds. Bob testified that of the six vehicles Lisa listed on her inventory, only four were actually marital assets. Two were his nonmarital assets: a 1963 Cadillac Coupe DeVille and a 1973 Volkswagen Beetle. Bob prepared a list of the marital vehicles and his estimate of their current fair-market value, which was admitted into evidence. His stated preference was for Lisa to keep the 2002 Honda Odyssey minivan that was in her possession. The three remaining were a 1982 Volkswagen Rabbit, a 1993 Isuzu Rodeo, and a 2005 Audi. Bob said Lisa could have the 1982 Volkswagen, but he wanted the 1993 Isuzu he used for utility purposes and he preferred to have the 2005 Audi because it was "newest." He added that he would be fine with whatever the judge decided was appropriate.

Bob wanted reimbursement from Lisa for all the money she spent on her romantic relationship with Mary Alice. This, he said, included credit transactions and cash disbursements that he thought were directly tied to their courtship, which he tallied at $24,404.32. He said he reviewed documents Lisa produced in discovery where he found marital funds spent for dinners, liquor and wine, lodging, clothing, cash— "things that I know were not expenses for me and were not expenses on behalf of the kids."

As far as their businesses, Bob accepted Lisa's "conservative estimate" on the value of her inventory at Kids Korner, which was kept in a warehouse owned by Lisa's mother. He argued that her Kids Korner account money was misused for Lisa's ro-

mantic pursuits. As for his law practice, he said the only remaining items in his office were used or old furniture, which Lisa had listed on an exhibit that was entered into evidence. Bob testified that because he was very near closure of his private practice to become a full-time city attorney, his accounts receivable were "nominal." He stated that his mother loaned them $53,000 to buy the law-office building. He had no documentation to support the existence of such a loan, and he admitted no payments had ever been made to his mother.

Bob admittedly quit depositing his paychecks into their joint account after they separated. He said he created a detailed daily account of charges and expenses at the end of the year in 2009, and then he divided the balance in the joint account evenly, each party receiving the amount used by the other, resulting in the $21,000 withdrawal Bob took from the account. Bob also presented his own tally of expenses paid and rents received by each from the beginning of 2010 forward, when he began using his own account, which was admitted into evidence. According to Bob's calculations, each owed the other for things like medical costs for the children, utility expenses, rental repairs, and rental income. These ended in Bob determining that he owed Lisa $1,230.12, which he paid her by check. Bob believed he was doing the best he could to keep all reimbursements current, and he said that he never deprived Lisa of her part of the rent income or his part of repairs, utilities, and children's expenses.

At the conclusion of the hearing, the trial judge took the matter under advisement for a month before issuing a fourteen-page order in July 2010. Bob was awarded the divorce on his counterclaim against Lisa. The trial judge, after summarizing portions of testimony derived from some of the seventeen witnesses, concluded that these were both good and loving parents who had differing parenting approaches, neither of which were contrary to the children's best interest. The judge found that Bob's work responsibilities necessarily affected the amount of time Bob was able to spend with the children. The judge, noting the unfortunate circumstance of Lisa's affair and her failure to be forthcoming about it, nonetheless concluded that there was no evidence that Lisa and her girlfriend acted inappropriately in the presence of the children. On this topic, the judge stated, "Although the Court does not condone [Lisa] introducing a romantic partner to the children, in the present case, that fact alone does not negate the fact that [Lisa] has been the primary caregiver of the children from the date of birth to the present time." EB's stated preference was taken into consideration. Lisa was awarded primary custody of the children. Both parties were ordered to refrain from having any romantic partner to whom they were not married as overnight guests when the children were present, at home or on vacation. Bob was awarded liberal visitation, and he was ordered to pay child support and maintain health insurance for them.

As for division of assets and debts, the trial judge ordered all six pieces of marital realty (including the marital residence and Bob's law office) to be sold and the proceeds evenly divided. The parties' boat, jet ski, and flip trailer were ordered sold and the proceeds evenly divided. Individual items of personal property (furniture, household goods, etc.) as listed on the parties' exhibits were to be evenly divided. Each party retained two of the four marital vehicles: Lisa was awarded the 2002 Odyssey and 2005 Audi, and Bob was awarded the 1993 Isuzu and 1982 Volkswagen.

Lisa was permitted to retain the assets of her business called "Kids Korner" with any attendant debt, and Bob was permitted to retain the assets of his private law practice with any attendant debt. Each was permitted to retain one IRA in their own names of equal value, and one marital IRA valued at $15,527.09 was ordered to be divided evenly. Bob was awarded the Regal Securities account valued at just under $240,000 as nonmarital property, which Lisa had disclaimed against advice of her counsel. Lisa was awarded ownership of fifteen percent of stock in Zumwalt Enterprises, her family's business, which Bob conceded was hers as nonmarital.

The trial judge denied Bob's request to have a $53,000 loan from his mother deemed marital debt. The judge found he had failed to prove the existence of such a loan. The judge denied Lisa's request for reimbursements and reconciliation of their joint checking account from and after separation, finding that any funds Bob retained were marital and used to pay marital debt and toward items benefitting the children and family.

Bob's request for reimbursement from Lisa for marital funds used toward her romantic relationship was granted in part. The judge determined that assuming Bob's tally of $24,000 was accurate, Lisa would be responsible to reimburse Bob $12,000, but Bob could not prove the exact amount spent. Because some trips and entertainment were undeniable, the judge found Bob entitled to $2500 in reimbursement.

Bob presented a request for attorney's fees and costs of over $11,000 necessitated by Lisa's untruthful denials of the romantic relationship until the final hearing, by the efforts required to determine Lisa's income from her family's business, and by work required to defend against Lisa's request for alimony that she abandoned during the final hearing. Lisa filed a response in opposition, seeking to discount a substantial portion of those fees and costs as unrelated and unnecessary. Bob was ultimately awarded $8,864.80 in fees and costs in a separate order.

Both parties appealed, and we consider Bob's points first. In his first point on appeal, Bob argues that the trial court's decision to give Lisa primary custody was clearly erroneous and against the children's best interest. He echoes his assertions at trial, contending that Lisa is an adulterous liar who disobeys court orders and is a "friend" instead of a parent. We disagree that the trial court clearly erred.

It is true that unmarried cohabitation with a romantic partner, or a parent's promiscuous conduct or lifestyle, in the presence of a child cannot be abided. *Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001). Evidence of an extramarital affair is but one factor the trial court is to consider in deciding what custody arrangement serves the best interest of a child. *Atkinson v. Atkinson*, 72 Ark. App. 15, 32 S.W.3d 41 (2000); *Ketron v. Ketron*, 15 Ark. App. 325, 692 S.W.2d 261 (1985). Custody is not awarded to reward or punish either parent. *Eaton v. Dixon*, 69 Ark. App. 9, 9 S.W.3d 535 (2000). The paramount concern in a custody determination is the best interest of the child; all other considerations are secondary. *Ford v. Ford*, 347 Ark. 485, 65 S.W.3d 432 (2002). The trial court undoubtedly considered the ample evidence provided by both parents, their experts, their lay witnesses, their daughter, and the historical relationship between the parents and children. The trial court was mindful of the testimony when he ordered, as he had done in the temporary order, that neither parent have overnight visits by romantic partners, addressing the concern of inappropriate cohabitation. On this record, we cannot say

that there is clear error on the custody determination.

■ Moving to Bob's second point, he argues that the trial court erred in failing to award him any portion of the value of Lisa's gift-store inventory, which she estimated at $18,000. Bob was permitted to retain the value of his law practice, but the undisputed evidence was that he was near closure of that practice to fulfill his duties as full-time city attorney and its value was only in the used contents of the building, which were set out on their personal property lists that they equally split. The law-office realty was to be sold and the proceeds divided. Thus, he states he was deprived of $9000 in his portion of the marital asset Lisa retained in full. He also argues that the trial court unequally divided the parties' four marital vehicles without an explanation for doing so, manifesting clear error. He reasons that although they each were awarded two vehicles, the aggregate value of Bob's was $3000 whereas the aggregate value of Lisa's was $24,000, leaving him unfairly deprived of $10,500 worth of marital assets. We agree with him as to the inventory but not the vehicles.

■ Trial courts have broad powers in distributing marital property in order to effect a division that is fair and equitable under the specific circumstances present. *Keathley v. Keathley*, 76 Ark. App. 150, 61 S.W.3d 219 (2001). What is important is achieving an overall distribution of the marital estate that is fair under the circumstances. *Copeland v. Copeland*, 84 Ark. App. 303, 139 S.W.3d 145 (2003).

It is clear to us that the trial court was attempting to make as close to a 50/50 distribution of the entire marital estate as possible. The trial court ordered each party to retain the marital assets derived from the businesses they ran independently of one another. On the evidence, however, this is uneven distribution without an explanation. Lisa testified to an $18,000 value of the inventory of her business, Kids Korner. The law office building was to be sold and divided, and the contents (chairs, desks, conference tables, cabinets, couches, etc.) were included on the personal-property lists entered into evidence by the parties. The items on such lists were to be divided between the parties. Bob's unchallenged testimony established that his private practice was already out of business. The only conclusion to be drawn is that this was an uneven distribution, depriving Bob of $9000 in marital assets. We reverse on the this portion of Bob's second argument.

■ Addressing the vehicles, Bob's testimony reflected his desire for the court not to sell the vehicles and divide the proceeds but to give each party two of the marital vehicles. He identified the two particular vehicles he hoped to receive, but not on the basis of their current fair-market value. His testimony reflected how he would divide them based upon actual use and personal preference. In conclusion, he testified that he would be satisfied however the trial judge decided the issue. Inasmuch as Bob assented to whatever division the trial court chose to make of the vehicles, he cannot now be heard to complain about the court's division.

■ As Bob's final point on appeal, he contends that it was clearly erroneous for the trial court to award him only $2500 when he believed his review of documents entitled him to $12,000 that Lisa should have reimbursed him. Lisa and Mary Alice took a number of trips together, a fact not in dispute. The women's testimony disputed that marital funds were depleted to the extent Bob claimed. Mary Alice stated that she paid for some of their travel, and she stated that any expense

that Lisa incurred for her, she reimbursed Lisa.

It is permissible to have one spouse reimburse the other for improper expenses attributable to a paramour, and we have upheld decisions to do so. *Williams v. Williams,* 82 Ark. App. 294, 108 S.W.3d 629 (2003). It is also axiomatic that one must present evidence to prove such an assertion, and Bob could not do so with certainty. In the absence of more exacting documentation, and with the evidence from Lisa and Mary Alice in opposition, we cannot say that the trial court clearly erred in ordering this amount of reimbursement.

We now turn to Lisa's cross-appeal. She contends that the trial court clearly erred (1) by failing to require Bob to remit one-half of his income during their separation, which he ceased depositing into joint accounts, and (2) by failing to require Bob to repay her for living expenses for which he was responsible per the temporary order. There is no provision in the decree addressing marital income during the pendency of the divorce from either party. The temporary order does not address marital income either. The closing portion of the decree states that the court had "considered all other requests for relief, and hereby denies any claim not otherwise addressed in this Decree." The trial court specifically denied Lisa's request regarding reconciliation of the parties' joint checking account.

Lisa contends it was error for the trial court not to require Bob to remit half of his income to her pending the divorce. We disagree on these facts. Both parties retained marital income and did not remit half to the other. Both parties incurred and paid for reasonable and necessary expenses for themselves and the children. The incomes were used to fund their lives, which until the divorce, was all marital,

whether it came from their joint checking account or Bob's later-established independent checking account. The trial court was satisfied with Bob's evidence that he was supporting his family with his income while they remained married. This was a matter of credibility. *See Friend v. Friend,* 2010 Ark. App. 525, 376 S.W.3d 519. To the extent particular findings on this issue were necessary, Lisa failed to request them pursuant to Ark. R. Civ. P. 52(b).

Lisa also argues that the trial judge clearly erred in rejecting her request to reconcile the joint checking account when he found that the monies were used to pay for marital debt and for the benefit of the children and family. Again, this was a matter of extensive conflicting testimony from each party. Bob presented detailed accounts of where the money went, what it was for, and his conviction that he had paid all expenses and remitted all rental income that he was under a duty to pay. The trial judge made a credibility call on this issue, and this is one upon which we defer to the trial judge.

In summary, we affirm Bob's appeal with the exception of the ruling on division of Lisa's Kids Korner assets, and we affirm on Lisa's cross-appeal.

PITTMAN and HART, JJ., agree.