Cite as 2026 Ark. App. 289

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-25-455

| | | |
|---|---|---|
| KEITH MARKEY | | Opinion Delivered May 6, 2026 |
| | APPELLANT | |
| | | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26DR-24-459] |
| V. | | |
| AMBER MARKEY | | HONORABLE LYNN WILLIAMS, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## WAYMOND M. BROWN, Judge

Appellant Keith Markey appeals the Garland County Circuit Court's divorce decree in which it awarded appellee Amber Markey primary custody of the couple's son, MC, born on March 8, 2015, and awarded appellant visitation with MC every other weekend. The circuit court ordered appellant to pay $548.61 a month in child support.[1] Appellant argues that the divorce decree should be reversed. We affirm.

Amber filed a complaint for divorce on June 5, 2024, based on eighteen months' separation. Appellant filed a pro se response on July 3 asking for a divorce and for primary custody of MC. Appellant filed an amended response and counterclaim for divorce on July 26 after obtaining legal counsel. He alleged that he should be granted a divorce based on

---

[1]This amount was set during a temporary hearing, and the circuit court found that no evidence had been presented to change the amount.

appellee's infidelity, and he asked the circuit court for full custody of MC with appellee having only supervised visitation. He also made several allegations against appellee. On July 28, appellant filed a motion asking that appellee have only supervised visitation with MC. On August 6, appellee filed a response to appellant's counterclaim for divorce denying the material allegations of the complaint as well as a response to appellant's motion for supervised visitation denying the allegations. Appellant filed an emergency motion for temporary custody and visitation on August 20 alleging that appellee had gotten MC from school and had refused to let MC participate in football practice. Appellant admitted that this action alone did not rise to the level of an emergency but reiterated prior allegations he had made about appellee and asked the circuit court to grant him temporary custody with appellee having only supervised visitation with MC. Appellant filed an emergency repeated motion on August 21 setting out the contents of a text message he had received from appellee informing him that he was not going to get MC back and threatening to homeschool MC. A third motion was filed on August 22 whereby appellant stated that appellee had not allowed him to speak with MC over the phone the day before the motion was filed and also included other text messages from appellee. Appellee filed responses on August 28 denying the material allegations in appellant's emergency motions.

Appellee moved for temporary custody, supervised visitation, contempt, and child support on August 28. Appellee alleged that due to actions by the appellant, she should be granted custody of MC, appellant should have supervised visitation, appellant should be found in contempt for his actions, and she should be granted all necessary fees, including

2

attorney's fees. Appellee included an exhibit of injuries she claimed to have suffered at the hands of appellant. She also included a letter from the principal of Jessieville Elementary School outlining her contact with the parties concerning MC's education. She stated that most of her contact had been with appellee, and while appellant never contacted her regarding MC's education, she had spoken to appellant in the last few months about custody. She outlined the issues with MC's transportation from school and stated it had become so problematic that she had been forced to schedule a meeting with the parties in an attempt to resolve it. She stated that MC was anxious all the time and was so worried about his transportation or who he would see that it affected his academic performance; the parties never had anything good to say about each other; and in her professional opinion, MC needed consistency. Appellee included other exhibits containing text messages from appellant degrading her, among other things. Appellant filed an answer and counterclaim on September 9. Appellant admitted in part and denied in part the material allegations of appellee's motion. He asked the circuit court to grant his request for custody, to grant appellee only supervised visitation, and to grant him attorney's fees and any other relief available to him. Appellee filed a response to appellant's counterclaim on September 20 denying each allegation contained in the counterclaim. Appellant filed an emergency motion on September 26 asking the court to prohibit appellee's interference with his contact with MC. Appellee filed an ex parte petition for temporary custody, supervised visitation, contempt, and child support on October 15. She included an affidavit outlining events she claimed took place between her and appellant on October 3 as well as text messages between

3

the parties. Appellant filed an answer and counterclaim to appellee's ex parte petition on October 25 denying the material allegations of the petition. In his counterclaim, he asked that he be given full custody of MC; that appellee have supervised visitation within certain guidelines he set out; and that he be awarded child support, attorney's fees, and any other fees, including court costs and fees. Appellee filed a response on November 1 denying the material allegations of appellant's counterclaim.[2]

A temporary hearing was held on November 12. In the November 13 temporary order, the circuit court found that joint custody was not feasible due to appellant's behavior, that appellant's testimony was not credible, and that appellant systematically abused the system to keep MC away from appellee. Appellee was granted primary custody subject to appellant's visitation with MC every other weekend. Appellant was ordered to pay $548.61 in monthly child support and to pay $2,500 of appellee's attorney's fees within sixty days of the order. The circuit court denied appellant's various motions as well as appellee's ex parte motion for custody.

Appellant filed a motion to compel appellee to amend her grounds for divorce to adultery on November 21. Appellee amended her complaint for divorce on November 22 to allege general indignities as her grounds for the divorce. Appellee also filed a response to appellant's motion the same day and denied the material allegations. The parties filed several motions after the temporary order was filed, and in an order filed on January 7, 2025, those

---

[2]Between November 11 and 12, appellant filed hundreds of pages of other documents in the form of exhibits.

4

motions were either denied outright or held in abeyance, to be heard at the final hearing. Several other motions, answers, responses, and documents were filed before the final hearing. Appellant's counsel moved to withdraw on February 13, and the circuit court filed an order the same day allowing her to withdraw.

The final hearing took place on April 1. Appellee testified that she and MC currently resided with her boyfriend, Daniel Ryan Thompson, whom she began dating in February 2024. She said that MC and Thompson love each other. Appellee stated that she suffered physical and verbal abuse from appellant following a motor vehicle accident they were involved in in 2006. She said that she and appellant have one son together, and he was ten years old at the time of the final hearing. She stated that she left appellant on December 31, 2023, and that she started dating Thompson in February 2024. She testified that since she obtained temporary primary custody of MC in November 2024, he has been doing well in school and that his grades are picking up. She stated that appellant continued to emotionally abuse her even after she left. She said that he was texting so frequently that she had to block him. She stated that appellant's degrading communication did not stop with her: he would contact her family members, and he would continue this behavior when she called MC while he was visiting appellant. She said that due to appellant's behavior, she did not believe they could coparent. She stated that she and appellant had an agreement that appellant would not coach or do anything to participate with MC while MC is playing baseball but that after she signed MC up for baseball, she learned that appellant was helping to coach. She stated that she subsequently pulled MC out of baseball. She testified that appellant had paid only

$110 toward his child-support obligation. She also said that he had not paid the court-ordered attorney's fees. She asked that the circuit court find appellant in contempt for his failure to make the court-ordered payments. Appellee testified that she wanted primary custody of MC. She said that she currently makes twenty-five dollars an hour cleaning homes for a living.

Appellant asked appellee during cross-examination whether she had ever been abusive toward him, and appellee testified that as far as being abusive toward appellant, she has reacted to appellant's actions or, in other words, she defended herself. She stated that she slapped appellant twice because he grabbed her by her hair and broke her hand. She also admitted slapping appellant's brother for coming onto her porch, grabbing her, and calling her names. She testified that she had moved three times since leaving appellant: (1) to a camper with no room for her or MC; (2) to a three-bedroom home that she left because MC sleep walks, and she did not want him walking down the stairs and out the front door; and (3) to a home where MC's bedroom is connected to her bedroom, and she is able to see his room from her room. She stated that MC is not safe living with appellant because when she lived with appellant, he drank too much, took too many pills, and had an abusive family.

On redirect, appellee testified that appellant has drunk ever since she met him and that he began taking pain pills after their wreck in 2006, and he never stopped. She stated that she believes appellant still has a problem with alcohol and pills. She said that about a month before the hearing, appellant chased her around the bleachers at a basketball practice

and that there is a recording of it.  She stated that MC told her he loves the current home a lot more.

Thompson testified that he lives in Hot Springs Village with appellee and MC.  He stated that they have lived together since May 2024.  He said that he works at Sozo Addiction Recovery Center and has been there for a little over a year.  He denied using any controlled substances or having any child- or domestic-abuse convictions or allegations.  He said that he gets along great with MC and that he plans to marry appellee once she is divorced.  He stated that he is financially able to help appellee.  He testified that he was not dating appellee when she left appellant.  On cross-examination, Thompson stated that he has been clean from methamphetamine for almost four years and alcohol-free for over three years.

Tommie Ann Vidrine, appellee's mother, testified that she talks to appellee nearly every day.  She stated that the accident changed both appellee and appellant and that following the accident, their relationship was dangerous.  She said that she was worried about the way appellant treated appellee and that every time her phone rang, she was afraid it was going to be a call telling her that appellee was in the emergency room.  She stated that she did not believe appellant would hurt MC.  She said that appellee is happier and back to her old self since leaving appellant and that life with appellant made appellee's life miserable and intolerable.  She opined that MC is doing great and appears healthy and happy.  She stated that Thompson is great for appellee and MC.  She said she does not talk to appellant anymore because he would say bad things about appellee in communications with her.

On cross-examination, Tommie stated that appellee "such a mess" and could not work or even function because appellant tried to throw her out of the house daily. She said that she had heard appellant yelling at appellee through the phone when she was around. She denied saying that appellant is a bad father.

On redirect, Tommie stated that it was not appropriate for appellant to call appellee a liar and a whore in front of MC, for appellant to chase appellee around bleachers and argue with her in front of MC, or to speak to appellee badly over the phone when MC can hear him. She said that appellant sends appellee voluminous text messages and talks terrible to appellee and threatens her. She opined that the current custodial arrangement is good for MC because MC is doing much better. She stated that appellee and appellant could not coparent due to the way appellant currently treats appellee. She said that appellant's treatment of appellee is unchanged from the way it has been the last few years of their marriage.

Appellant testified that appellee left in December 2023. He described his communication with appellee since their separation as difficult. He denied calling appellee names in front of MC or where MC could hear him. He said that he did not really want full custody of MC, that was his attorney's idea, because he feels like MC needs them both in his life. Appellant admitted he had paid only $110 toward child support but said it was because he had surgery at the end of February. He said he did not pay the attorney's fees order in the temporary order because he could not afford it due not only to his surgery but also to the weather. He testified that he just wants MC to have a stable home. He denied drinking

8

alcohol and stated that he is prescribed only 112 oxycodone pills a month; however, he admitted that he has run out of the pills before the month is over. He stated that appellee left them with nothing, no groceries, no money to buy any, and no vehicle, and the power was about to get shut off. He said that he and appellee have not been able to communicate about important things for MC but denied that it was his fault. He testified that appellee pulled MC from baseball because she thought he was helping to coach, but he was just helping out like all the other parents do. He stated that he felt like appellee was punishing MC for something MC did not do. He said that MC loves for him to coach, as do all the other children on the team. He denied sitting next to appellee at a game and calling her names under his breath or chasing her around any bleachers.

Appellee rested her case, and appellant testified on his own behalf. He stated that he saw the pictures appellee had included with her documents but insisted that appellee's injuries were the result of him protecting himself from her. He denied ever hitting appellee and said that she was the abusive one in the relationship. He stated that he used to drink beer, but he stopped because appellee asked him to. He denied that he abuses pain medication. He stated that MC is safe at his home and that there is family around. He said that he does not want full custody, but he wants to be able to see MC more than two to four days a month. He also stated that it is important for MC to be in one home, not bouncing back and forth. On cross-examination, appellant stated that he did not remember sending certain text messages to appellee.

9

April Anderson testified that she had gone to the parties' home on September 8,[3] they were standing outside screaming and fighting, and she tried to get them to calm down. She stated that she and appellee never really got along. She opined that appellant is a great father and that MC would benefit from living with appellant. She stated that she believed the parties should share equal custody of MC. She said that she believes appellee needs mental help and that when her mental issues[4] are under control, she is a great mother. She stated that appellee smoked marijuana around MC when she had a marijuana card and that she took pain pills.

On cross-examination, Anderson stated that she is appellant's sister. She said that she is currently divorced and that she and her ex-husband share equal custody of their children. She admitted that appellee had a restraining order against her at one time.

Ted Vidrine, Tommie's husband, testified that he remembers appellant calling and saying that appellee would not allow him to leave because they were arguing. On cross-examination, he stated that he is concerned about MC's safety around appellant, but he is not concerned with MC being around appellee. He described appellee as a good mother and said that MC seems happy and healthy. He opined that the current custodial agreement is good for MC. On redirect, Ted stated that he did not think it was fair for appellant to only get to see MC two to four days a month.

---

[3]There was no year stated.

[4]Anderson described appellee's mental issues as screaming, fighting, suicide attempts, and taking pills.

Upon re-call by appellant, appellee testified that she and MC are both in therapy together because MC treats her how appellant treated her. She stated that she began seeing someone the last year of their marriage. She said that joint custody should not be an option at this time due to appellant's actions. On cross-examination, appellee stated that she cannot coparent with appellant because she does not believe appellant can communicate with her, listen to her, or consider her opinion on things concerning MC. She stated that appellant has not been acting in MC's best interest.

The circuit court granted appellee a divorce from appellant on the ground pled. It found that the parties cannot coparent and that it was in MC's best interest to continue with the prior custody and visitation arrangement. The standard holiday visitation was included as part of appellant's visitation. The circuit court stated that it did not find most of appellant's testimony credible and stated that appellant is the problem.

The April 2, 2025 divorce decree granted appellee a divorce from appellant based on general indignities and granted her sole primary custody of MC subject to appellant's visitation after finding that the presumption of joint custody had been overcome. The order noted that appellant's testimony was not credible as it had not been credible at the temporary hearing. The temporary child-support amount became permanent. Appellant was held in contempt for failing to pay the temporary child support as ordered and for not paying the court-ordered attorney's fees within sixty days of the order. Appellee was awarded an additional $2,500 in attorney's fees to be paid within sixty days of the divorce decree.

Appellant was ordered not to call or text appellee outside of the parenting application My Family Wizard.  Appellant filed a timely notice of appeal on April 28.  This appeal followed.

Our standard of review in domestic-relations cases is well settled.  This court reviews domestic-relations cases de novo, but we will not reverse the circuit court's findings unless they are clearly erroneous.[5]  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[6]  Due deference is given to the circuit court's superior position to determine the credibility of witnesses and the weight to be given their testimony.[7]  The supreme court has stated that there is no other case in which the superior position, ability, and opportunity of the circuit court to observe the parties carries a greater weight than one involving the custody of minor children.[8]

Appellant argues that we should reverse the divorce decree for a number of reasons: (1) marital infidelity does not favor custody, (2) instability does not favor custody, (3) lack of motivation does not favor custody, (4) appellee's explosive irrational behavior should not be overlooked, (5) appellee's drinking and drunken state do not favor custody, (6) giving custody to appellee and failing to award equal time with appellant is not supported by the record, (7)

---

[5]*Doss v. Doss*, 2018 Ark. App. 487, 561 S.W.3d 348.

[6]*Id.*

[7]*Id.*

[8]*Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001).

a court's decision may not rest on credibility, and (8) custody with appellant is in MC's best interest. Appellant also argues that we should reverse the child-support award, modify visitation, and set aside the fee awards.

The primary consideration in child-custody cases is the welfare and best interest of the child, with all other considerations being secondary.[9] In an original child-custody determination, there is a rebuttable presumption that joint custody is in the best interest of the child.[10] The presumption may be rebutted if the court finds by clear and convincing evidence that joint custody is not in the best interest of the child.[11] While there is a statutory preference for joint custody, this preference does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the child.[12]

Appellant contends that marital infidelity does not favor custody. Evidence of an extramarital affair is but one factor the circuit court is to consider in deciding what custody arrangement serves the best interest of a child.[13] The best interest of the child is still the paramount concern in a custody determination.[14] Custody is not awarded to reward or

---

[9]*Wallace v. Pyle*, 2024 Ark. App. 496.

[10]Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(a)* (Supp. 2023).

[11]Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(b)(1)*.

[12]*Tubbs v. Tubbs*, 2025 Ark. App. 315, 716 S.W.3d 204.
[13]*Bamburg v. Bamburg*, 2011 Ark. App. 546, 386 S.W.3d 31.

[14]*Id.*

punish either parent.[15] Here, after considering the evidence before it, the circuit court found that it was in MC's best interest to be in appellee's custody. The circuit court was fully aware of appellee's extramarital affair as well as her cohabitation with someone following her separation from appellant. Despite this, the circuit court still found that it was in MC's best interest for appellee to be awarded primary custody. On this record, we cannot say this was clearly erroneous.

Appellant argues that instability does not favor a custody award. He contends that he has worked the same job for over thirty years and that appellee's employment history and current efforts pale in comparison to his. The circuit court was well aware of appellant's and appellee's employment history. However, at the time of the final hearing, appellee was working cleaning houses and earned twenty-five dollars an hour. Thompson, who wished to marry appellee, testified that he was financially able to help appellee. Additionally, there was no evidence that MC had been negatively affected by appellee's employment history. In fact, by all accounts, he was doing well and seemed happy and healthy.

Appellant contends that appellee's lack of motivation does not favor the present custody award. Appellant fails to cite anywhere in the record where it was stated that appellee lacked motivation to work. Additionally, the cases relied on by appellant for this argument have nothing to do with the issue at hand (initial custody determination). Additionally, appellant's arguments that appellee's explosive, irrational behavior should not be overlooked

---

[15]*Id.*

and that her drinking and drunken state do not favor custody in her are not supported by any authority. This court will not consider arguments not supported by convincing argument or citation to authority, and we will not make an appellant's argument for him or consider an argument that is not properly developed.[16]

Appellant argues that awarding appellee custody and failing to award equal time with appellant is not supported by the record. In an original child-custody determination, there is a rebuttable presumption that joint custody is in the best interest of the child.[17] The presumption may be rebutted if the court finds by clear and convincing evidence that joint custody is not in the best interest of the child.[18] While there is a statutory preference for joint custody, this preference does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the child.[19] Evidence showed that communication between the parties was very hostile due to appellant's behavior. We have stated that the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the child's welfare is a crucial factor bearing on the propriety of an award of joint custody.[20] Given the hostility between the parties and their inability to cooperate in coparenting, it is evident that joint custody would not have been in MC's best interest.

---

[16]*Buzbee v. Blann Transp., Inc.*, 2025 Ark. App. 206, 712 S.W.3d 362.

[17]Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(a)*.

[18]Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(b)(1)*.

[19]*Tubbs, supra.*
[20]*Hoover v. Hoover*, 2016 Ark. App. 322, 498 S.W.3d 297.

Appellant argues that the circuit court's decision may not rest on credibility. However, we give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses.[21] This deference to the circuit court is even greater in cases involving child custody since a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the child.[22] Child-custody cases are unique because there are no other cases in which the superior position of the circuit court to assess witness credibility carries as much weight.[23] The primary consideration in child-custody cases is the welfare and best interest of the child; all other considerations are secondary.[24] Here, the credibility of the witnesses was important because it helped the circuit court decide which parent should have custody of MC. The circuit court found that appellant's testimony was not credible and that he was the root cause of the problems between the parties. After considering all the evidence before it, it decided that it was in MC's best interest for appellee to have primary custody. This finding is supported by the evidence.

---

[21]*Starr v. Starr*, 2015 Ark. App. 110, 455 S.W.3d 372.

[22]*Id.*

[23]*Id.*

[24]*Id.*

Without citation to legal authority, appellant contends that it is in MC's best interest for appellant to have custody. We will not consider arguments not supported by citation to authority.[25]

As his final point, appellant argues that we should reverse the circuit court's child-support award, we should modify visitation, and we should set aside the fee awards if we decide to reverse appellee's custody award. For the reasons stated above, we affirm the circuit court's custody award and affirm all other aspects of the divorce decree.

To the extent that appellant's arguments are a request that we reweigh the evidence, reevaluate the witnesses' credibility, and evaluate both differently than did the circuit court, we decline to do so. We do not reweigh evidence in these cases; rather, we give special deference to the superior position of the circuit court in weighing the evidence.[26]

Affirmed.

THYER and WOOD, JJ., agree.

*Robert S. Tschiemer*, for appellant.

*Christopher Shane Ethridge*, for appellee.

---

[25]*Buzbee, supra.*

[26]*Fergerson v. Ferguson*, 2024 Ark. App. 551, 700 S.W.3d 802.