SLIP OPINION

Cite as 2014 Ark. App. 697

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-14-233

| | | |
|---|---|---|
| REGINA JO WEBB | | **Opinion Delivered** December 10, 2014 |
| | APPELLANT | APPEAL FROM THE GRANT COUNTY CIRCUIT COURT [NO. (27) DR-2011-168-2] |
| V. | | |
| | | HONORABLE EDDY ROGER EASLEY, JUDGE |
| LESTER WEBB | | |
| | APPELLEE | AFFIRMED |

**ROBERT J. GLADWIN, Chief Judge**

Appellant Regina Jo Webb seeks a reversal of the November 26, 2013 decree of divorce in the Grant County Circuit Court. She argues that the circuit court erred in awarding her only $225 per week in permanent alimony, dividing the marital property equally, and in not requiring appellee Lester Webb to pay her attorney's fees. We affirm.

On November 2, 2011, appellee filed a complaint seeking a divorce from appellant on the ground of general indignities. On November 16, 2011, appellant filed an answer to the complaint along with a counterclaim for divorce, also on the ground of general indignities. Additionally, she sought an unequal allocation of the marital debt, temporary and permanent alimony, and a reasonable attorney's fee.

A temporary hearing was held on January 11, 2012, and a temporary order was entered on February 1, 2012, wherein the circuit court ordered appellee to pay appellant $550 per week in temporary alimony beginning January 18, 2012, and continuing pending

further order of the circuit court. Appellee was also ordered to pay appellant's stepfather the amount of $3,044.86 for expenses related to appellant's care from the time she moved into her stepfather's home after the parties separated. The issue of an attorney's fee was held in abeyance.

Final hearings were held on January 20, 2013, and April 12, 2013, at which time the circuit court heard the testimony of several witnesses including both parties, and multiple exhibits were received into evidence. After the parties submitted proposed findings of fact and conclusions of law, the circuit court entered a final decree of divorce on November 26, 2013, granting appellee a divorce from appellant on the ground of eighteenth months' separation. The decree ordered that appellee would pay appellant permanent alimony in the amount of $225 per week, that the marital assets would be divided equally, and that each party would be required to pay their own attorney's fee.

On December 2, 2013, an amended agreed order concerning marital property was filed wherein it was noted that all personal property had been divided, that appellant agreed to transfer her interest in the marital home to appellee for the amount of $43,500, and that she also agreed to transfer her interest in a certain mobile home to the parties' son. Other agreed orders and qualifying domestic relations orders (QDROs) concerning the property and assets were also entered. Appellant filed a motion for reconsideration of the final decree on December 2, 2013, and on December 10, 2013, appellee filed a reply to the motion for reconsideration. Subsequently, appellant filed a reply to the response to the motion for reconsideration, but no order was entered addressing the various pleadings filed after the

SLIP OPINION

divorce decree was entered. Appellant filed the appropriate and timely notices of appeal and amended notices of appeal in the circuit court, and this appeal followed.

On appeal, divorce cases are reviewed de novo. *Brave v. Brave*, 2014 Ark. 175, 433 S.W.3d 227. Decisions such as those involving alimony, division of marital property, and attorney's fees, however, fall within the sound discretion of the circuit court and are reviewed for an abuse of that discretion. *See id*. It should also be noted that the division of marital property and an award of alimony are complementary devices that a circuit court may employ to make the dissolution of the marriage financially equitable. *Yancy v. Yancy*, 2014 Ark. App. 256. There can be no abuse of discretion and a circuit court's decision regarding these issues cannot be overturned unless it can be demonstrated that it exercised its discretion improvidently or thoughtlessly without due consideration. *Smithson v. Smithson*, 2014 Ark. App. 340, 436 S.W.3d 491.

## I. *Permanent Alimony*

An award of alimony is not mandatory but rather is discretionary, and the circuit court's decision regarding any such award will not be reversed on appeal absent an abuse of that discretion. *Smithson, supra*. This court has recognized that a circuit court is in the best position to view the needs of the parties in connection with an alimony award. *Id*. The purpose of alimony is to rectify the economic imbalance in the earning power and standard of living of the divorcing parties, in light of the particular facts of each case. *Id*. The primary factors are the financial need of one spouse and the other spouse's ability to pay, but other factors are the circumstances of the parties; the couple's past standard of living; the value of

jointly owned property; the amount and nature of the income, both current and anticipated, of both parties; the disposition of the homestead or jointly owned property; the condition of health and medical needs of the parties; and the duration of the marriage. *Id.* The need for flexibility outweighs the need for relative certainty in assessing alimony. *Id.* If alimony is awarded at all, it should be an amount that is reasonable under all the circumstances. *Id.*

Appellant argues that the award of only $225 per week for permanent alimony was unreasonable and an abuse of discretion when one considers the circuit court's factual findings, which appellee does not challenge on appeal. Considering her inability to work, her debilitating disease, her lack of income, her lack of insurance, their long marriage, the homemaker services she provided, the need for constant care, the $400 per week required for care, appellee's good health, his secure job, and his income appellant urges that the amount awarded was clear error.

The circuit court found that in addition to myotonic dystrophy, appellant suffers from "numerous physical ailments." One of the exhibits introduced was the deposition of A.H. Tilley, M.D., who testified as to appellant's medical condition, noting that she had myotonic dystrophy, a progressive muscle weakness, and additional ailments including diabetes, urinary incontinence, anemia, depression, gastroesophageal reflux disease, hyperlipidemia, and hypercalcemia. He explained that myotonic dystrophy makes diabetes more difficult to control, and nerve damage from her diabetes will cause her to increasingly lose sensation in her hands and feet. Moreover, her diabetes requires the purchase of special, more expensive foods. Dr. Tilley explained that reflux disease is common in people with myotonic

4

dystrophy because weakened muscles in the stomach and esophagus no longer prevent acid from bubbling back up. In view of her physical ailments, particularly her myotonic dystrophy, Dr. Tilley explained that he would not be surprised if her life expectancy is only two to three years.

Appellant points us to evidence in the record indicating that, as her condition deteriorates, she will need skilled care at $17.50 to $25 per hour. Her monthly medication co-pays for 2012 averaged about $140 when she was covered by appellee's insurance. Without it, she claims that her medication costs will increase exponentially. Moreover, appellant has outstanding balances with her healthcare providers, which she pays on a monthly basis. Her expense breakdown for March 2012 to January 2013 shows that her expenses are for basic necessities, including $1,672.96 for healthcare expenses (about $152 per month), which did not include medication co-pays or unskilled paid care expenses.

In contrast, appellee's admitted monthly expenses were approximately $1,642.59. Health insurance accounted for $270, but that amount decreases without appellant carried on the plan. More than a quarter of his expenses, $444, are for his new truck. Appellant takes issue with other discretionary expenses submitted by appellee as well as a large cash withdrawal ($7,770.52) during the pendency of the case.

Appellant submits that the circuit court decreased the alimony payment to $225 from the $550 required in the temporary order based on testimony from a financial planner, Harry Ehrenberg. Ehrenberg testified that as appellee ages, he will be unable to maintain the same level of work productivity, thus reducing his income. Appellant notes that Ehrenberg did

not testify, however, that appellee's income had started to decline, when it would begin to decline, or how quickly it would decline. He instead testified that appellee's earning capacity is peaking and that it will "eventually" start declining. Appellee's employment records show that he earned more in 2012 than ever before ($98,860) and that he was working at a pace in 2013 to earn even more ($104,457). Appellant claims that as things stand, his income might not decrease until long after she dies. She acknowledges that if it begins to decline before then, appellee can seek a reduction in alimony. *See Spears v. Spears*, 2013 Ark. App. 535. In conclusion, she claims that for the circuit court to award only $225 per week based on Ehrenberg's presumption and conjecture on something that might not happen for years was an abuse of discretion. *See Bethune v. Bethune*, 192 Ark. 811, 94 S.W.2d 1043 (1936).

The record establishes that the parties had been married thirty-four years and had two grown children, one of whom died in 2008. During the course of the marriage, appellee was gone approximately fourteen hours per day, working twelve-hour shifts, with two hours' drive time. For approximately six years prior to the time the parties separated, appellee prepared food and drinks for appellant before he left for work, and he did all the cleaning, cooking, and yard work because of her declining health. It was noted that when appellant broke her foot and became confined to a wheelchair as a result of that injury and her muscular degenerative condition, she complained about doing physical therapy and just wanted to stay home. The parties' daughter-in-law testified that she believed that appellant was confined to the wheelchair because she wanted to be and would not undertake physical therapy to improve her condition.

Appellee testified that he filed for divorce because he was tired of appellant not wanting to do anything, and he felt like he had done all he could do. He had worked for Entergy at Redfield for thirty-two years and was an operation tech who monitored equipment or ran a dozer. He would do shift work in twelve-hour shifts, fourteen days a month, or in a twenty-eight day rotation. He would get up and fix appellant food before he left for the day at 6:00 a.m., and it was usually 8:30 p.m. before he arrived back home. Appellee noted that he had seen a change in appellant over the past ten years that started when she broke her ankle and became afraid to do things because she thought she would fall.

Appellee explained that throughout the marriage and until she was confined to the wheelchair, appellant did some babysitting and received some money but never contributed to paying the marital bills. He was the one responsible for the income in the marriage and had been responsible for the monthly bill paying the last six years, as well as being solely responsible for cooking, cleaning, and the upkeep of the house during that time.

Before the date of separation, appellee paid off several bills including marital debts out of his 401(k) plan from which he withdrew $22,826.34—the plan having a value of $234,059.91 as of December 21, 2012. The parties had the marital residence built in 1981 which was valued at $87,000, and the balance of approximately $15,000 owed on the house was paid off from these funds around March 2011. Additionally, appellee paid off appellant's car, his son's car, and several credit-card bills. The goal was to become debt free, and appellant was in agreement with that plan. He also paid off a loan out of the 401(k) plan and bought five acres of land in Colorado in late 2010 or early 2011 for which he paid $8350.

In addition to that property, the parties had a condo timeshare in Branson, which was purchased in 2001 or 2002 for what he believed to be $3700. Appellee also had an account at Telcoe Credit Union through which he financed his truck, which had a balance on the loan of $16,997.

Appellee explains the testimony of Ehrenberg, who valued the marital estate at $330,000, including $263,000 in assets and a little under $26,000 in liabilities. While it was noted that appellee had an $18,000 vehicle, he owed $17,000 against it. Additionally, he had an $8000 vehicle but owed the IRS $5000. Jointly, the parties had three pieces of real property, which comprised about twenty-six percent of the equity. The value of those properties, which had no debt, was $95,700.

The evidence also established that appellant, who was fifty-two years old, lived with her stepfather. She noted that when her stepfather died, she expected to have nine acres of land that would be given to her, and that if she were to have use of her stepfather's home, she would have to remodel it. Her stepfather noted that he would give her the house when he passed away, but he did not think she could live by herself.

Here, the circuit court carefully considered the evidence and the respective positions of the parties, noting that appellee had been paying appellant temporary alimony at a rate of $550 per week. The circuit court determined that permanent alimony was warranted and set it at $225 per week. The circuit court made its decision with deliberation, taking into account the required factors, including: the financial need of appellant and the ability of appellee to pay; the financial circumstances of the parties; the amount and nature of income,

both current and anticipated of both parties; the extent and nature of the resource and assets of each of the parties; and the earning ability of both parties.

As this court noted in *Smithson*, *supra*, which involved an allegedly disabled spouse, an award of alimony, if one is indeed justified at all, is measured by the particular facts and circumstances of the parties before a circuit court. There, this court noted it would not substitute its judgment for that of a circuit court, and would only determine whether the alimony decision is reasonable under all the circumstances. With appellant being paid permanent alimony and receiving half of the marital property, we hold that the award of permanent alimony was reasonable. *See Halk v. Halk*, 2009 Ark. App. 803 (decision to completely deny alimony found to be abuse of discretion where parties were married forty-five years, wife had no income, and husband insisted she not work throughout course of the marriage).

II. *Equal Division of Marital Property*

Arkansas Code Annotated section 9–12–315 (a)(1)(A) (Repl. 2009) provides that at the time a divorce decree is entered all marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable. This principle concerning division of marital property is a presumption, *see West v. West*, 103 Ark. App. 269, 288 S.W.3d 680 (2008), that equal division of the marital property is what is fair and equitable in a divorce case. A circuit court is given broad powers to distribute all property in divorce cases, marital and non-marital, in order to achieve a fair and equitable distribution. *Marks v. Marks*, 2014 Ark. App. 174, 432 S.W.3d 698. In making such a distribution a court need not do so with

mathematical precision. *Friend v. Friend*, 2010 Ark. App. 525, 376 S.W.3d 519. A division of marital property will be not be reversed unless it is clearly erroneous. *Wainwright v. Merryman*, 2014 Ark. App. 156. The clearly erroneous standard is met only where the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Atchison v. Atchison*, 2012 Ark. App. 572.

Because of appellant's debilitating disease and inability to earn an income versus appellee's solid financial position and well-paying job, she claims that the circuit court clearly erred in dividing the marital property equally. Because seventy-one percent of the parties' net worth was in the 401(k) account and the parties stipulated to much of the other property, the real issue is over the division of that account. The only "offset" to the equal division was that appellee be responsible for the $16,500 loan on his new truck, an IRS debt of $5254, and his signature loan of $3561. Appellant notes that appellee had already agreed to assume the truck debt and testified that he was not asking the circuit court to make appellant responsible for it, which he incurred four or five months before he told her he wanted a divorce. Appellant claims that the signature loan was in large part to pay for his attorney's fees. Moreover, appellant notes that she has to pay taxes on any part of the 401(k) account she withdraws, which she claims she must do "to survive," while appellee is able to keep his portion of the money in the account, let it grow tax free, and pay no taxes until he withdraws it in retirement.[1]

---

[1]Ehrenberg testified that money transferred into the QDRO account is not taxed, but he did not address money that she withdraws from it for living expenses, which is taxed.

Appellant also asserts that appellee's pre-separation spending highlights the inequity of the distribution. Appellee admitted that he withdrew either $73,557.92 or $76,121.92[2] from his 401(k) in April 2011, six months before he told appellant he wanted a divorce, and started spending it—only some of it being spent to pay expenses of the marital estate.

There was evidence introduced of payments for non-marital-estate expenditures totaling $14,169.03, all of which were made to or for appellee's son, daughter-in-law, or mother. Appellant notes that the circuit court made no adjustment based on those payments. If truck-related purchases, e.g., new wheels, are included—debt which appellee agreed to accept—the total is $20,558.05. She claims that this extensive spending on non-marital property leading up to the separation and then the purchase of a new truck and related expenses heighten the inequitable nature of the circuit court's division of property.

We disagree, noting that while appellant sought an unequal distribution of the marital assets, the circuit court specifically found that an unequal division and distribution of the marital assets would not be appropriate upon examining the factors set forth in section 9-12-315. The decisions regarding alimony and property division are to be reviewed together because ultimately the circuit court is to make a just allocation to achieve an equitable distribution.

---

[2]The circuit court found that appellee withdrew $73,557.92, but appellee testified that he made all the payments on his list with money from his 401(k). Those payments total $76,121.92. A document in the record, but not introduced as an exhibit, indicates that the circuit court's amount is correct—but the discrepancy of the amount is not really the issue.

With respect to indebtedness, the circuit court did make appellee solely responsible for the debts to the IRS and Telcoe Federal Credit Union that amounted to $8815. This ruling ensured appellant would not be responsible for that debt. The circuit court also had evidence before it that appellant had a place to live rent free that would become her residence if her stepfather should pass away. Appellee acknowledged that he withdrew funds from his 401(k) plan as noted, but he did so to pay off marital debt and make the parties virtually debt free, a plan with which appellant was in agreement at the time.

Under the particular facts and circumstances of this case, we hold that the circuit court's division of the marital property was not clear error. Accordingly, we affirm on this issue.

### III.  *Attorney's Fees*

Finally, appellant argues that the circuit court abused its discretion in not awarding her attorney's fees.  *See Halk, supra.*  It instead made the parties responsible for their own fees, appellant in the amount of $15,385.56, and appellee in the amount of $11,756.99.

The award of attorney's fees in a domestic-relations case is a matter within the circuit court's discretion, and there is no fixed formula for determining what constitutes a reasonable amount.  *Yancy, supra.  See* Ark. Code Ann. § 9-12-309(a)(2).  The circuit court has the inherent power to award attorney's fees, and whether the court should indeed award any attorney's fees rests within its sound discretion.  *Tiner v. Tiner*, 2012 Ark. App. 483, 422 S.W.3d 178.  Because the circuit court presides over the case and gains familiarity with it as well as the extent and quality of the services rendered by the attorney, it has a superior

opportunity to assess the critical factors, and an award of attorney's fees will therefore not be set aside absent an abuse of discretion. *Id.*

In determining whether to award fees, courts consider the parties' financial abilities. *Halk*, *supra*. *See Page v. Page*, 2010 Ark. App. 188, 373 S.W.3d 408 (husband's income was three times the wife's); and *Poole v. Poole*, 2009 Ark. App. 860, 372 S.W.3d 420 (husband's income was twice the wife's). Because of the disparity in the parties' income detailed above, appellant maintains that appellee is in a far better position to pay her attorney's fees. Appellant urges that it was an abuse of discretion for the circuit court not to require appellee to pay her attorney's fees in this divorce proceeding that he initiated.

We disagree. Appellant sought an award of a "reasonable attorney's fee." Appellee testified that the income he listed for 2012 and the projected income for 2013 were not normal for him because he worked almost 500 hours in overtime in 2012. Additionally, expert testimony indicated that he was at the point where he was peaking and should start to show some decline in income production because, at his age, there are limits as to what he can do physically given his education and occupation.

We disagree with appellant's reliance on *Page*, *supra*, and *Poole*, *supra*, in support of her argument that ordering each party to pay their own attorney's fee constituted an abuse of discretion. Neither of those cases hold that a circuit court abuses its discretion in refusing to order the party having more income to pay the other party's attorney's fee.

The issue of attorney's fees must be viewed in light of and in conjunction with the alimony and marital-property-distribution issues wherein appellant received permanent

alimony and an equal share of the marital property, which was substantial in nature, in order to determine whether the circuit court achieved a fair and equitable result. Based on the record before us, we hold that it was equitable and within the circuit court's broad discretion to order each party to pay for their own attorney's fee. *See Barnes v. Barnes*, 2010 Ark. App. 821, 378 S.W.3d 766; *Halk, supra.*

Affirmed.

WALMSLEY and VAUGHT, JJ., agree.

*Sherry Burnett*; and *Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*The Law Offices of J. Brent Standridge, P.A.*, by: *J. Brent Standridge*, for appellee.