BART F. VIRDEN, Judge
Tarrance Rawls appeals the Pulaski County Circuit Court decision denying his request for rehabilitative alimony. Tarrance also argues that the circuit court incorrectly divided the marital debt and failed to equally divide a bank account with a balance of $40,000. We affirm.
I. Relevant Facts
On October 10, 2016, Brandi Yarberry (Rawls) filed a complaint for divorce from Tarrance Rawls in which she asked the circuit court to decide, among other issues, the property rights and obligations of the parties. The parties have one child, AR, who was born in 2014. Tarrance filed a response and a counterclaim for separate maintenance. A hearing was held on December 21, 2016, and a temporary agreed order was read into the record. In the agreed order, the parties agreed that Tarrance would have exclusive use and possession of the parties' rental home through the end of the lease in June 2017. Tarrance agreed to be responsible for the lease payment and utility bills, and Brandi agreed to pay Tarrance $1,000 on December 21, 2016, $900 on January 1, 2017, and $900 on January 15, 2017. Beginning February 1, 2017, Brandi agreed to deposit $2,700 into Tarrance's checking account on the first of each month through the final lease payment in June. The parties agreed that neither party would pay child support and that they would each pay half the cost of daycare. The parties also agreed that they would equally divide any healthcare costs not covered by insurance.
On March 23, 2017, Brandi filed a motion for contempt in which she alleged that Tarrance had not paid the lease, the utilities, or his half of the daycare expenses as they set forth in the temporary agreed order. On May 1, 2017, Brandi filed a motion for abatement asserting that she *540 should be released from her obligation to make payments to Tarrance.[1]
The circuit court held a final divorce hearing on September 20, 2017. At the hearing, Brandi explained that when she and Tarrance married in 2014, she earned around $50,000 a year as a medical resident. Brandi explained that when she finished her residency and started earning more money, Tarrance quit working several side jobs he had taken. She testified that she did not ask him to quit but that they had agreed he was able to quit. Brandi maintained that despite receiving roughly equal incomes during their marriage, she paid more of the bills, and Tarrance spent more money on himself. She explained that they were "often in financial distress, despite all of that, because there was lots of spending on his part."
Brandi, a child psychiatrist, testified that she is now employed as a contract physician at Pinnacle Pointe Hospital. She explained that because she is a contract physician no taxes are taken out of her paycheck, and she deposits 30 percent of each paycheck into a "tax account." Brandi's net monthly income is $13,891.71. Brandi testified that she pays $970 a month for rent, she plans to start depositing $1,500 a month in a 401k retirement account, and she pays $700 a month for health insurance for her and AR. Brandi testified that she had not started making payments on her student-loan debt; however, she and Tarrance had planned that she would begin doing so in 2018 and that her student-loan payment would be $5,000 a month. She testified that she has two student loans-one for $16,948 and one for $368,839. Brandi testified that she owes Cynthia Rawls $3,500 in loan repayment, and she owes $4,000 in repayment to her grandmother. Brandi testified that her credit-card debt is around $5,500 on one card, $1,600 on a second card, and $500 on a third. She owes $1,200 for her work computer.
Brandi testified that Tarrance owned four cars during the marriage. When the parties married, Tarrance owned a truck. Soon after they were married, he upgraded to a Lexus SUV. Brandi owned a small Lexus coupe, but she replaced that car with Tarrance's Lexus SUV so that Tarrance could buy a GMC Yukon. Brandi testified that after he purchased the Yukon, Tarrance bought his dream car, a BMW 650i convertible. Brandi stated that she had felt bullied by Tarrance and that she signed the note for the BMW against her financial advisor's advice. Brandi explained that Tarrance had promised that the purchase of the BMW would not affect their finances and that he would work a side job if necessary to make the payments.
Brandi testified that RPM Management Co. is pursuing $6,542.61 in unpaid rent against both her and Tarrance. Brandi explained that Tarrance did not pay the rent on their marital home despite their agreement that she would pay him her share for the remainder of the lease agreement and that he would make the payment to the leasing agent. Tarrance told Brandi that he wanted to buy the rental house, and though she doubted his ability to do so, that was the arrangement. Tarrance stopped making payments on the lease in March even though it did not expire until June. Brandi also explained that Tarrance did not pay for daycare as they had agreed and that she would like the court to order him to pay the $2,150 he owes her. Brandi *541 listed about $150 in dental and doctor bills for AR that Tarrance did not pay. Brandi testified about various utility bills, overdrawn accounts, taxes, and cable bills that Tarrance did not pay and that she paid to keep her credit rating from being negatively affected. Brandi explained that she paid the $1,300 tax on Tarrance's Yukon because the DMV would not let her register her car until that debt was paid, and she requested reimbursement for that payment.
Brandi clarified that the decision to file their taxes separately was one they made together to limit the financial impact of her student loan debt on their family. Brandi testified that Tarrance did not like the decision, and he did not want to meet with the financial advisor to discuss the matter as she suggested, but he agreed to file separately. Brandi explained that she encouraged Tarrance to file his taxes, and he chose not to.
Tarrance testified that he had been a police officer for fifteen years and that he hoped to become a detective. Tarrance stated that his biweekly net income is $1,650.19. Tarrance testified that Brandi had asked him not to file his taxes and that she had told him that she would help him pay the debt at a later time. He estimated that he owes $7,000 in delinquent taxes. Tarrance stated that he paid $800 a month in rent to live in his mother's home, but he did not provide proof of payment of rent. He maintained that he paid $475 a month in childcare costs for both AR and a child from a previous relationship, but he did not provide proof of that expense either. As for AR's childcare, he explained that he stopped paying after having made four payments. Tarrance testified that the temporary agreed order concerning the lease and utility bills set forth that he would be responsible for making those payments; however, he asserted that because Brandi was late paying him her portion of the lease one time, the lease payment was late, and RPM refused to accept payment. Tarrance stated that he spent Brandi's half of the lease payments, in total $10,900, on "rent and monthly household expenses." Tarrance admitted that he paid the bills that were in his name only, and he admitted that he paid the note on his BMW every month. He also testified that he bought the BMW against the financial advisor's advice and after he quit his moonlighting jobs. He testified that he had Brandi's permission to buy the car.
Tarrance explained that he failed to give notice when he ceased moonlighting and that when someone fails to give notice, employers no longer trust that person. He testified that he was happy to quit his extra jobs and that he did not think there would be a financial impact when he quit. Tarrance testified that he needs from $1,300 to $1,500 a month for two years to catch up on his bills and taxes. Tarrance stated that during their marriage, he paid for Brandi's board exams, DEA license, and medical license, totaling $3,800.
In the divorce decree entered October 27, 2017, the circuit court made the following detailed findings: Brandi is employed as a children's mental health professional at Pinnacle Pointe Hospital. She is akin to an independent contractor, and her employer does not withhold taxes from her paycheck; thus, Brandi deposits 30 percent of her income into a "tax account" with an approximate balance of $40,000 at the time of the hearing. Brandi's income is $13,891.71 each month, and her monthly expenses are $11,740. She has not yet begun make payments on her student loans, which amount to $368,839, but plans to begin doing so in 2018. Tarrance is a police officer, and he earns $52,000 a year and $1,378.04 biweekly. He plans to become a detective, which will increase his salary.
*542 Tarrance's monthly expenses are $5,274.69, and that amount includes $475 a month in child care, though he does not pay that expense regularly. Tarrance's car payment is $864.07 a month. When the parties were married, they were each earning around the same income. Early in the marriage, Tarrance worked as an off-duty police officer at various places, and he might have earned more money than Brandi during that time. He stopped moonlighting when Brandi began working as a mental-health professional, and her salary increased. Both parties are in good health and are relatively young. During the marriage, the parties entered into a lease agreement for a rental home. When the parties separated in October 2016, Brandi agreed to pay Tarrance a portion of the expenses for the home, and Tarrance agreed to make the payments. Brandi was late making one payment to Tarrance while she was unemployed, and she paid Tarrance around $10,900 between October 2016 and April 2017. In April, Brandi learned that Tarrance was not paying the lease, and she moved to abate the payments due to Tarrance's noncompliance with the agreement. Tarrance was unable to explain how he spent the money. The management company enforcing the lease sued Brandi and Tarrance for $6,875 in unpaid rent.
The circuit court determined that Tarrance was solely responsible for the remaining debt on the lease, finding that
Plaintiff paid Defendant the amounts she was to have paid him, yet he did not use that money to fulfill his obligations under the lease. Defendant's hands are unclean in this regard.... Any other outcome would be inequitable and would punish the Plaintiff for doing what she was ordered to do, and reward Defendant for failing to do what he agreed to do.
The circuit court ordered that because Tarrance had not fulfilled his obligation to pay half of AR's daycare, $237 in child support would be automatically deducted from each paycheck. Brandi was ordered to maintain AR's health insurance, and the circuit court found that the parties would split any medical expenses that arose and were not covered by health insurance.
The circuit court ordered that Brandi and Tarrance are solely responsible for their own car payments and insurance and that each party would hold the other harmless if called on to make payments on the other party's car. Both parties were encouraged to trade in their vehicles for "something that is more in line with their budgets."
The circuit court denied Brandi's request for reimbursement of daycare expenses and out-of-pocket medical expenses "due to the disparity in the parties' earnings and earning capacity." Tarrance was ordered to reimburse Brandi for the personal-property tax she paid toward the Yukon, and the circuit court found that Tarrance was solely responsible for his tax debt. The circuit court denied Tarrance's request for $1,500 in monthly rehabilitative alimony, finding that
[t]he parties were married only three years. At the time of their marriage, their earnings were about equal. Plaintiff hired a financial advisor, and while Defendant went to see the financial advisor with the Plaintiff, he did not always follow the advice given by the advisor. Defendant is in good health, and, as previously mentioned, relatively young. He plans to become a detective, and he loves his career. He is highly employable. Plaintiff will ultimately make more money than Defendant; however, she will also be solely responsible for the repayment of over $360,000 in loans. Defendant is absolved of any responsibility *543 to repay any portion of these loans.
Tarrance filed a timely notice of appeal. On appeal, Tarrance challenges the circuit court's decision to deny his request for rehabilitative alimony, to hold him solely responsible for the lease arrearage, and to refuse to divide Brandi's "tax account" equally between the parties. Tarrance's arguments are not well taken, and we affirm.
II. Points on Appeal
A. Rehabilitative Alimony
We review domestic-relations cases de novo on the record, but we will not reverse the circuit court's findings unless they are clearly erroneous. Page v. Page , 2010 Ark. App. 188, at 3, 373 S.W.3d 408, 410. A decision regarding alimony is a matter that lies within the circuit court's sound discretion and will not be reversed on appeal absent an abuse of that discretion. See Hiett v. Hiett , 86 Ark. App. 31, 158 S.W.3d 720 (2004). An abuse of discretion means discretion improvidently exercised, i.e., exercised thoughtlessly and without due consideration. Webb v. Webb , 2014 Ark. App. 697, at 3, 450 S.W.3d 265, 269. The circuit court is in the best position to view the needs of the parties in connection with an alimony award. Smithson v. Smithson , 2014 Ark. App. 340, 436 S.W.3d 491.
Rehabilitative alimony is "alimony payable for a short, but specific and terminable period of time, which will cease when the recipient is, in the exercise of reasonable efforts, in a position of self-support." Foster v. Foster , 2016 Ark. 456, at 10, 506 S.W.3d 808, 815(citing Bolan v. Bolan , 32 Ark. App. 65, 71, 796 S.W.2d 358, 362 (1990) ). Our courts have analyzed the concept of rehabilitative alimony using the same factors that apply to permanent alimony. Id. We have stated that the purpose of alimony is to rectify the economic imbalances in earning power and standard of living in light of the particular facts in each case. Taylor v. Taylor , 369 Ark. 31, 250 S.W.3d 232 (2007). The primary factors to be considered in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. Kuchmas v. Kuchmas , 368 Ark. 43, 243 S.W.3d 270 (2006). In addition, the following secondary factors should be considered: (1) the financial circumstances of both parties; (2) the couple's past standard of living; (3) the value of jointly owned property; (4) the amount and nature of the parties' income, both current and anticipated; (5) the extent and nature of the resources and assets of each of the parties; (6) the amount of income of each that is spendable; (7) the earning ability and capacity of each party; (8) the property awarded or given to one of the parties, either by the court or the other party; (9) the disposition made of the homestead or jointly owned property; (10) the condition of health and medical needs of both husband and wife; (11) the duration of the marriage; and (12) the amount of child support. Moore v. Moore , 2016 Ark. 105, 486 S.W.3d 766.
Tarrance's argument is not well organized or particularly cogent, and at times in his brief he admits that he was careless with money during the marriage. On appeal, Tarrance seems to assert that the circuit court erred because it did not rectify the economic imbalances between the parties by awarding him rehabilitative alimony, and he focuses on his inability to pay his expenses and Brandi's ability to pay alimony. We disagree with his position that because Brandi is able to pay alimony, it was error for the circuit court to deny his request.
In denying Tarrance's request, the circuit court considered the short duration of *544 the marriage and that they both had entered the marriage earning about the same income. The circuit court found that Tarrance is highly employable, in good health, relatively young, and he plans to advance in the career that he loves. The circuit court noted that while Tarrance attended meetings with Brandi's financial advisor, he failed to follow the advice given. The circuit court acknowledged that Brandi will ultimately earn more money than Tarrance but that she was also solely responsible for over $360,000 in student-loan debt.
On the record presented for our de novo review, we are not left with a distinct and firm impression that a mistake was made in the circuit court's denial of rehabilitative alimony. The circuit court clearly considered many secondary factors when it denied Tarrance's request for rehabilitative alimony, including the length of the marriage, the couple's past standard of living, the nature of the parties' income-both current and anticipated-the earning capacity of each party, the age and health of the parties, and the fact that Tarrance paid child support that amounted to one-half of the daycare expense. We hold that the circuit court did not act thoughtlessly, improvidently, or without due consideration, and on this point we affirm.
B. Allocation of Debt
For his second point for reversal, Tarrance argues that the circuit court erred by finding that he is solely responsible for the lease arrearage and his personal tax debt. We disagree and affirm the circuit court's allocation of debt.
The allocation of marital debt is an essential item to be resolved in a divorce dispute and must be considered in the context of the distribution of all the parties' property. Adams v. Adams , 2014 Ark. App. 67, at 16, 432 S.W.3d 49, 60. Under Arkansas Code Annotated section 9-12-315 (Repl. 2015) the presumption of equal division does not apply to the division of marital debts. Id. The circuit court has the authority to consider the allocation of debt in a divorce case. Baker v. Baker , 2013 Ark. App. 543, 429 S.W.3d 389. A circuit court's decision to allocate debt to a particular party or in a particular manner is a question of fact and will not be reversed on appeal unless clearly erroneous. Id. A finding of fact is clearly erroneous if, after reviewing all of the evidence, the appellate court is left with a definite and firm conviction that a mistake has been made. Brice v. Brice , 2013 Ark. App. 620, at 1, 2013 WL 5872290.
Tarrance's briefing of this issue is disorganized and difficult to follow, but he seems to assert that even though Brandi paid her agreed portion of the lease, he should not be responsible for his portion of the payments because Brandi "knew he couldn't afford it by himself." The circuit court's decision regarding the lease arrearage reflects Brandi's testimony that pursuant to the agreed temporary order, she paid her portion of the lease
directly to Tarrance, who was responsible for paying the leasing agent. The circuit court found that Tarrance had not made the lease payments, and he could not explain where the money Brandi paid him had gone; thus, it would be inequitable to punish Brandi for fulfilling her obligation and reward Tarrance for disregarding his promise to pay the lease. The circuit court expressed its intention to make an equitable decision in regard to the lease arrearage, and we hold that the circuit court did not clearly err by assigning this debt solely to Tarrance.
Tarrance also argues that the parties agreed to file taxes separately to lessen Brandi's student loan payment, which led to Tarrance's losing certain tax credits and his choosing not to file his taxes for three years; thus, Tarrance argues, *545 the circuit court erred by not finding that Brandi should be responsible for his tax debt. The crux of Tarrance's argument seems to be that he and Brandi agreed that she would help him pay any delinquent taxes that arose from their arrangement and that she encouraged him not to file; however, Brandi testified at the hearing that she never suggested that Tarrance not file his taxes, and in fact, she encouraged him to file. Brandi testified that she was not sure what the tax consequences would be for Tarrance when they agreed to file taxes separately and that "I had wanted to go meet with the C.P.A. to learn this, to talk about this, and figure out a plan for our family, but he never went back with me. It never happened." We give due deference to the circuit court's superior position to determine the credibility of witnesses and the weight to be given their testimony.
Fields v. Fields , 2015 Ark. App. 143, at 3, 457 S.W.3d 301, 304. In light of Tarrance's and Brandi's conflicting testimony regarding the handling of the tax issues that arose during the marriage, we cannot say that the circuit court erred in allotting Tarrance's personal tax debt to him.
C. The Tax Account
Tarrance asserts that the circuit court clearly erred by not equally dividing the $40,000 in the "tax account." We disagree.
Arkansas Code Annotated section 9-12-315(a)(1)(A) provides that "at the time a divorce decree is entered, all marital property shall be distributed one-half (1/2) to each party unless the court finds such a division to be inequitable." Nevertheless, our property-division statute does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably. Williams v. Williams , 82 Ark. App. 294, 108 S.W.3d 629 (2003).
At the hearing, Brandi testified that because she is a contract physician, Pinnacle Point pays her $18,000 a month without any deductions. She explained that on the advice of her financial advisor, 30 percent of each paycheck is diverted to an LLC account that is not distributed to her and is solely for the purpose of paying taxes. Brandi stated that her plan is to pay the full tax amount due for 2017 by the end of the year, which at the time of the hearing was only two months away. The circuit court acknowledges in the order that Brandi's employer "does not withhold taxes from Plaintiff's paycheck. Plaintiff sets aside thirty percent (30%) of her income and puts it in a tax account. At the time of the hearing,
she had paid no estimates on her taxes, but reckoned there was about $40,000 in the tax set aside account."[2] The circuit court's decision reflects Brandi's testimony that because taxes were not automatically deducted from her paycheck, she was required to independently prepare for tax payments. Tarrance's argument that "[i]f the court would have awarded the appellant $20,000 of the amount in the bank account, the appellee would have made that much additional monies by the time that the taxes were due" does not acknowledge that the account was earmarked for tax payments. The circuit court took into account that Brandi is required to keep up with a tax-payment fund, *546 whereas Tarrance employs the more typical automatic tax deductions from each paycheck. The circuit court's order acknowledges that the sole purpose of the LLC account is to pay income tax, and the decision effects an equitable distribution of marital property. We find no error, and we affirm.
Affirmed.
Gladwin and Vaught, JJ., agree.

In the divorce decree, the circuit court ruled that the motion to abate was moot and denied the motion for contempt.

The circuit court erred in its finding that Brandi's monthly expenses are $11,740 "independent of her student loan debt, which she has not yet started to pay." The amount found by the court includes Brandi's student-loan expense and retirement expense, which Brandi designated as expenses she was not paying at that time. The circuit court's total is incorrect; however, the error is immaterial to the analysis regarding the circuit court's decision to allow Brandi to retain the tax account in full.